Opinion
 

 BENKE, J.
 

 Robert Gene Estrada was found guilty of possession of cocaine for sale and admitted an allegation within the meaning of Health and Safety Code section 11370.4, subdivision (a)(5), that the amount of cocaine possessed was in excess of 40 kilograms. He was sentenced to a term of 24 years. Estrada appeals, arguing he was denied the right to a fair trial by the misconduct of counsel for a codefendant and that the trial court erred in failing to require the prosecution to reveal the identity of a confidential informant. We reverse.
 

 Facts
 

 A.
 
 Prosecution Case
 

 Beginning at 4:30 p.m. on June 8, 1995, officers of the Imperial County Narcotics Task Force placed appellant’s El Centro home under surveillance. As the officers watched, appellant and another man looked at a pickup truck parked in the driveway. Two other vehicles drove up and parked near the house. The drivers of both vehicles got out, walked together to the side of appellant’s garage and disappeared from view. About 10 minutes later they reappeared, got into their vehicles and departed. One of the men was codefendant Miguel Fonseca.
 

 About 6:40 p.m., appellant’s 17-year-old daughter Jennifer left the house and walked down the sidewalk. Appellant’s wife, Blanca Ortiz, then came from the house, got in a car and started to drive away. Jennifer stopped her. As they talked, Ortiz looked over her shoulder at agents sitting in an unmarked police car. Appellant next left the house and got into a vehicle. He started to drive but stopped to talk to Jennifer. As he did so, he looked back at the same police vehicle at which Ortiz had looked. The officers concluded Jennifer was conducting countersurveillance.
 

 Officers approached appellant and with guns drawn detained him. Jennifer began screaming and an officer told her to shut up or she would be detained
 
 *1093
 
 as well. Appellant stated: “Keep her out of it. Keep her out of this problem. She doesn’t know anything about it.”
 

 Pursuant to a warrant, officers searched appellant’s house and garage. In the garage they found 10 neatly stacked boxes. The boxes contained 269 bricks of white powder wrapped tightly in plastic. The total weight of the powder was 265.3 kilograms. Tests indicated the powder was cocaine with a purity of 87 percent. The value of the cocaine as packaged was $9 million to $10 million and when cut for street sale would be worth $45 million to $55 million. Inside the packaging was found contact paper bearing the logo of a company in Medallin, Colombia.
 

 The boxes were all neatly closed with packaging tape. Each box bore a mailing label addressed to Continental Airlines in Los Angeles. The mailing and shipping documents and the stickers on the boxes were all from Southwest Chromyzing Company (Chromyzing), an aircraft parts repair facility located in El Centro and Mexicali. Five of the ten boxes bore shipping documents signed by codefendant Fonseca and all the documents were dated 1993.
 

 Under a table near the stacked boxes, the officers found another box with appellant’s name on the top. The box contained packaging material and Chromyzing labels like those on the boxes containing the cocaine. Tape rollers were also found in the garage.
 

 After being arrested, appellant told the officers the boxes did not belong to him but belonged to Miguel Fonseca. Officers went to Fonseca’s house. Fonseca denied any knowledge of the cocaine. Fonseca stated he met appellant at his former job. He had been to appellant’s house that afternoon to drink beer. Fonseca told the officers that before they arrived appellant called and stated he was under arrest. Fonseca did not understand what appellant wanted him to do.
 

 Fonseca had been an employee of Chromyzing and worked at its El Centro plant from 1989 to 1994. Appellant worked for the same company, primarily at one of its Mexicali plants, until laid off in May 1995.
 

 Fonseca was in charge of several inventory pools maintained by Chromyzing and took over the Continental Airlines pool in early 1993. Fonseca kept records of all airline parts coming into and leaving the pool and had control of the documents used to do so. Fonseca would sign the documents, like those attached to the boxes containing the cocaine, when airline parts were returned to the El Centro Chromyzing facility after being repaired at the
 
 *1094
 
 Mexicali plants. The pink copy of those documents, like those found attached to the boxes containing the cocaine, were retained until a month-end reconciliation of inventory and then could be retained or destroyed as Fonseca saw fit.
 

 Appellant’s job was repairing plant electronics and he was not involved in the repair of airline parts or shipping.
 

 The boxes containing the cocaine were the kind used at Chromyzing to ship parts to customers. The boxes were packaged and labeled in the exact manner Chromyzing used to send parts to airlines.
 

 A drug trafficking expert concluded the cocaine found in Estrada’s garage was part of a sophisticated operation involving multiple persons. Appellant’s function was to supply a “stash house” where the cocaine would be held for several days. Fonseca was the facilitator whose job it was to provide a stash house. The expert believed the drugs had been packaged at appellant’s residence as part of an ongoing operation.
 

 B.
 
 Appellant’s Defense
 

 Appellant testified he met Fonseca when they both worked for Chromyzing. They became friends and Fonseca visited appellant at his home once or twice a week. On the afternoon of June 7, 1995, Fonseca came to appellant’s house and asked if he could store some boxes in his garage overnight. Appellant said he could. Later in the day, appellant noticed the boxes in his garage but did not pay close attention to them. The box in which the packaging material was found was appellant’s but it was empty when he put it in the garage. The packaging materials in the box were not his and Fonseca did not tell him the boxes he placed in appellant’s garage contained cocaine.
 

 On the afternoon of June 8, Fonseca came to appellant’s house and told him he would be picking up the boxes that evening. Later, appellant and his wife argued with their daughter Jennifer. Jennifer left the house. Shortly thereafter, appellant also left the house and started to drive away. He stopped to talk with Jennifer. She told appellant that some men were looking at the house and she thought they were the police. The officers came forward and at gunpoint placed appellant under arrest. Appellant testified he stated to one of the officers: “[Wjhatever his problem was, my daughter had nothing to do with it.”
 

 When the officers informed appellant they found cocaine in boxes in his garage, he told them the boxes belonged to Fonseca.
 

 
 *1095
 
 At the jail, appellant was allowed to make a telephone call. He called Fonseca, “cussed him out” and asked Fonseca what he had done to him and why. Fonseca told appellant not to worry, that he would take care of it.
 

 After his arrest, appellant was contacted by an attorney, Oscar Ruiz de Chavez, who told appellant Fonseca was paying him to represent appellant. Ruiz de Chavez had previously represented appellant in an unrelated matter. Appellant’s sister testified Ruiz de Chavez twice told her Fonseca was paying for him to represent appellant.
 

 Ruiz de Chavez represented appellant at the preliminary hearing and until the arraignment in superior court. Ruiz de Chavez testified Fonseca had not hired him to represent appellant. Ruiz de Chavez stated he was hired on June 12 to represent appellant by a man who identified himself only as appellant’s cousin. Indeed, after accepting $1,500 in cash from the man, Ruiz de Chavez made out a receipt to “Robert’s cousin.”
 

 C.
 
 Fonseca’s Defense
 

 Fonseca testified he had no knowledge of the boxes and cocaine in appellant’s garage. He stated he had not hired Ruiz de Chavez to represent appellant.
 

 Discussion
 

 A.
 
 Misconduct by Fonseca’s Attorney, Bennett Goodman
 

 Appellant argues he was denied due process and other specific constitutional rights by the egregious and continual misconduct of Fonseca’s attorney, Bennett Goodman.
 

 After a review of the record we find a pattern of conduct by Goodman, beginning in opening statement and not ending until closing argument, which resulted in a denial of appellant’s right to due process. Apparently affronted by the trial court’s denial of several of his motions, including perhaps most importantly his motion for severance, and committed to proving that appellant and not his own client was guilty of the crime, Goodman engaged in repeated inflammatory and prejudicial misconduct.
 

 1.
 
 Law
 

 While it is clear that the conduct of counsel for a codefendant can violate a defendant’s constitutional rights (see
 
 People
 
 v.
 
 Hardy
 
 (1992) 2
 
 *1096
 
 Cal.4th 86, 157 [5 Cal.Rptr.2d 796, 825 P.2d 781];
 
 People
 
 v.
 
 Haldeen
 
 (1968) 267 Cal.App.2d 478, 481-483 [73 Cal.Rptr. 102]), there are few cases on the matter, and the law generally applicable to such situations is not well developed. Since we conclude, however, that the direction of a blow is less important than the wound inflicted, we decide that the analysis applicable to prosecutorial misconduct, if not a perfect template, is at least a useful guide for the review of misconduct committed by counsel for a codefendant.
 

 A federal constitutional violation occurs when the behavior of a prosecutor “ ‘ “comprises a pattern of conduct ‘so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.’ . . .” ’ ”
 
 (People
 
 v.
 
 Padilla
 
 (1995) 11 Cal.4th 891, 939 [47 Cal.Rptr.2d 426, 906 P.2d 388].) Misconduct does not require bad faith nor an appreciation by the prosecutor of the wrongfulness of the conduct.
 
 (People
 
 v.
 
 Bradford
 
 (1997) 15 Cal.4th 1229, 1333 [65 Cal.Rptr.2d 145, 939 P.2d 259].)
 

 2.
 
 Background
 

 a.
 
 Comments Concerning Prior Arrest
 

 (1)
 
 Facts
 

 During
 
 in limine,
 
 motions, appellant’s counsel noted that at the time of appellant’s arrest he made a statement to the officers that he had been blamed once before for the possession of marijuana that belonged to someone else. Counsel explained appellant was referring to a prior charge later dismissed by the prosecution after appellant passed a polygraph test. He asked that the statement be excluded.
 

 The court stated it had too little information to rule at that time, noted the statement was probably admissible but asked appellant to renew the motion later in trial.
 

 During his opening statement, Goodman told the jury that at the time of his arrest, appellant stated: “This is just like the last time when they found drugs in my house. That I beat that case.” Appellant objected, stating that was not the statement made and that in any case the statement was inadmissible. The prosecutor agreed. Appellant moved for a mistrial. The trial court reminded Goodman it had not yet ruled on the admissibility of the statement and told him not to address the matter during opening statement.
 

 As Goodman continued to discuss appellant’s relationship with Ruiz de Chavez, he told the jury appellant and Ruiz de Chavez were not strangers
 
 *1097
 
 since “the evidence [would] show that Mr. Ruiz de Chavez beat a drug case for Mr. Estrada back in 1987.” As Goodman began to repeat the statement, the trial court stopped him and asked the parties to approach the bench. Appellant made a motion for mistrial, stating that while it might be proper to note appellant and Ruiz de Chavez knew each other in the past, it was improper to discuss a prior drug case. The prosecutor stated that had he made the comment it would have been prosecutorial misconduct. The court recessed the proceeding and further discussion of the matter was conducted in chambers.
 

 Appellant suggested Goodman, by his improper argument, was seeking the separate trial he had been denied. The court indicated it believed Goodman’s remarks to be both improper and prejudicial. Goodman stated that given the nature of appellant’s claims concerning Ruiz de Chavez, the fact of his representation in a prior drug case was admissible. The court stated it did not know what would be admitted concerning appellant’s prior relationship with Ruiz de Chavez but until that was resolved, it did not want it presented to the jury. The court indicated it was leaning towards granting a mistrial.
 

 Appellant stated he did not believe a curative admonishment would be useful and asked a mistrial be declared. Goodman stated he was happy with the jury. He suggested Fonseca continue with the jury as seated and appellant be granted a mistrial. The court stated it did not attribute any bad faith to Goodman but whether or not a mistrial was declared, the case would continue as a joint trial.
 

 In considering the issue of a mistrial, the court at first stated it would grant a mistrial, then took up the administrative problems that delay would occasion. When those matters were resolved, Goodman argued jeopardy had attached and objected to the granting of a mistrial. The trial court excused the jury for the weekend but did not discharge them.
 

 On Monday, the court first dealt with the issue of the admissibility of evidence concerning appellant’s prior relationship with Ruiz de Chavez. The court stated if it determined the fact appellant’s prior relationship with Ruiz de Chavez arose from a drug arrest was inadmissible, it would then have to make a final decision on whether to grant a mistrial. After extensive argument on that and other issues, the trial court ruled the fact of appellant’s prior drug arrest was inadmissible. The court also held appellant’s statement at the time of his arrest in the present case that it was “just like the last time he was arrested” was also inadmissible. The court stated it would allow appellant to present evidence concerning how Ruiz de Chavez came to
 
 *1098
 
 represent him in the present case. The court stated having so held, it would allow evidence that Ruiz de Chavez had represented appellant in the past but would not allow evidence concerning the exact nature of that representation.
 

 While finding that no mention should have been made by Goodman with regard to the reason for Ruiz de Chavez’s prior representation of appellant, it concluded a mistrial was not required. The court stated that given appellant’s concession he had been convicted of other crimes, the mention of another arrest for a drug-related offense was not severely damaging and could be dealt with by a curative admonition. Appellant pointed out that since Goodman had precipitated the need for a mistrial, he could not claim double jeopardy if a mistrial was declared. He also argued there had been several other damaging improprieties during Goodman’s opening statement and again asked for a mistrial.
 

 The trial court advised the jury that the comments of counsel are not evidence. Specifically, the court told the jury that Goodman’s reference to a previous arrest of appellant and a statement by appellant that “this had happened before” were not evidence.
 

 Later in opening statement, Goodman told the jury Ruiz de Chavez and appellant were not strangers. He stated: “The evidence will show that Mr. Ruiz de Chavez previously represented [appellant] on another case. ... I am not able—permitted—.” Appellant objected. The court sustained the objection and told Goodman to proceed as he had earlier been directed.
 

 Appellant testified at trial. Before cross-examination, the court cautioned Goodman not to probe the nature of appellant’s prior relationship with Ruiz de Chavez and not to ask if appellant was satisfied with the results of that relationship. The court told Goodman he could establish that appellant and Ruiz de Chavez had a prior professional relationship but that he was to go no farther. During cross-examination of appellant, Goodman twice asked appellant if he was unhappy with Ruiz de Chavez’s representation in the prior case. Twice appellant objected and twice the trial court sustained the objections.
 

 During his closing argument, Goodman discussed appellant’s relationship with Ruiz de Chavez. He noted there was evidence that Ruiz de Chavez represented appellant in the past. He then stated there was no evidence of when that relationship occurred or what it entailed. Goodman argued, however, there was evidence Ruiz de Chavez had been an attorney for 12 to 13 years and therefore he could not have represented appellant in his possession of drugs for sale or theft from interstate commerce cases, prior convictions
 
 *1099
 
 that had been admitted for the purpose of impeaching appellant, since they occurred 20 to 21 years before. Goodman stated: “[S]o ruling those out we know there’s a third case there.”
 

 Without objection from appellant, the trial court stopped Goodman and told the jury they were not to conclude from his remarks that appellant’s relationship with Ruiz de Chavez had anything to do with narcotics or theft or any criminal matter.
 

 (2)
 
 Discussion
 

 The Attorney General essentially concedes that Goodman’s comments during opening statement suggesting that in 1987 appellant “beat” a drug charge arising from an incident similar to the present charge were improper. He argues, however, that Goodman’s later questions related to that issue were appropriate since they tended to refute the claim that Fonseca hired Ruiz de Chavez to represent appellant. He also argues any harm arising from Goodman’s remarks was cured by the court’s admonitions to the jury.
 

 Suggesting appellant avoided conviction for a prior similar crime with a similar defense was improper. Once that suggestion was made, any question or remark related to that earlier incident, whether admissible in another context or not, would raise again the offensive suggestion. While a curative admonishment might be meaningful when some isolated incident of misconduct occurs, it is less useful when the misconduct is, as it was here, constant and pervasive.
 

 b.
 
 Evidence of Guilt Not Presented at Trial
 

 (1)
 
 Facts
 

 Appellant argues Goodman, and in one instance the prosecutor, committed misconduct by suggesting there was additional evidence of guilt not presented at trial.
 

 During opening statement, Goodman stated: “The evidence will show that search warrants are based on an—.” Appellant objected. The court sustained the objection. During trial, Goodman referred on a number of occasions to the fact appellant’s house was searched on the authority of a warrant.
 

 During closing argument, Goodman asked the jury what the odds were that the police had a search warrant for appellant’s house on the one day it contained $55 million worth of cocaine. He stated: “You know when they
 
 *1100
 
 get a search warrant, they don’t take out the Thomas Brothers guide, stick up the street map of El Centro on the wall, throw a dart at it and go ‘let’s hit this house.’ ” Goodman stated the officers knew cocaine would be at appellant’s house and wondered how it was appellant did not know the drugs were there.
 

 In his closing argument, the prosecutor joined in Goodman’s argument, repeating that the police do not decide to raid a house based on throwing darts at a map.
 

 (2)
 
 Discussion
 

 Taken in isolation, the cited questions and remarks are no more than a subtle suggestion that there were factors other than the evidence presented at trial showing appellant’s connection to the contraband found in his garage. However, we find such suggestions were part of a pattern of misconduct which portrayed appellant as a drug dealer who in the past had avoided conviction using a defense similar to that offered in this case and who exhibited a consciousness of guilt.
 

 We recognize objections were not made to all of the cited references to the search warrant, and in particular no objection was made to Goodman’s or the prosecutor’s closing arguments on the subject. Generally, such failure to object results in a waiver of consideration of the claimed misconduct. The reason for the rule requiring objection is to give the trial court an opportunity to correct the abuse and prevent any harmful effect.
 
 (People
 
 v.
 
 Green
 
 (1980) 27 Cal.3d 1, 27-34 [164 Cal.Rptr. 1, 609 P.2d 468].) When, however, as in the present case, the misconduct is part of a pattern, when the misconduct is subtle and when multiple objections and requests for mistrial are made, we conclude it proper for a reviewing court to consider the cited misconduct in evaluating the pattern of impropriety. (See generally,
 
 People
 
 v.
 
 Hill
 
 (1998) 17 Cal.4th 800, 820, 822 [72 Cal.Rptr.2d 656, 952 P.2d 673].)
 

 c.
 
 Comment on Exercise of Fifth Amendment Rights
 

 Appellant argues Goodman committed misconduct when, in both his opening statement and at trial, he commented on appellant’s refusal to testify at Fonseca’s preliminary hearing.
 

 (1)
 
 Facts
 

 During opening statement, Goodman told the jury appellant would testify at trial and that the evidence would show he had previously refused to testify in the case. Both appellant and the prosecutor objected. The court took a
 
 *1101
 
 recess. The court asked Goodman what was he doing. Goodman noted he had called appellant—who had already been bound over for trial in this matter—to testify at Fonseca’s preliminary hearing. Appellant invoked his Fifth Amendment right not to testify. Goodman" argued the fact of his refusal was relevant to his credibility under section 780 of the Evidence Code since it reflected on his attitude about the giving of testimony.
 

 Both the prosecutor and appellant confirmed that Goodman had called appellant as a witness at Fonseca’s preliminary hearing and he had asserted his right not to testify. Based on Goodman’s comment to the jury, appellant asked for a mistrial. Appellant stated it was clear from Goodman’s behavior he was doing everything in his power to create a mistrial. Appellant stated his only reluctance in seeking a mistrial was that in any new trial they would face the same problems with Goodman. Appellant stated it appeared Goodman was still seeking separate trials. Appellant argued Goodman’s comments about his invocation of Fifth Amendment rights was improper and highly prejudicial.
 

 The court, clearly very upset, denied the motion for mistrial, saying it was not going to grant Goodman a severance. The court stated, however, if things continued as they were, it might have to grant a motion for new trial to appellant if he was convicted. The court again told Goodman he was not getting a severance. Appellant’s counsel stated he had never seen anything like Goodman’s behavior in 25 years of practicing law. The prosecutor agreed it was unique in his experience. The judge stated he had been a judge for 15 years and had seen nothing like it.
 

 The court stated it was beginning to doubt Goodman’s good faith. The court stated if Goodman’s conduct proceeded in the same manner, it might have to take some action. Appellant asked the court to give an admonition to the jury explaining that appellant’s invocation of his Fifth Amendment rights at Fonseca’s preliminary hearing came only after Goodman improperly called him as a witness.
 

 Goodman stated he believed if appellant testified it was proper cross-examination to ask him about the invocation of his right not to testify at Fonseca’s preliminary hearing. The court stated he believed Goodman was in error and that the comment to the jury was a serious matter. The prosecutor stated his belief Goodman was attempting to force a mistrial. The court stated while it had not made up its mind, it was beginning to think so as well. The court reminded Goodman there would be no severance of the trials. The court told Goodman he believed his behavior was harming his client.
 

 
 *1102
 
 The jury returned to the courtroom and the judge told them: “Ladies and gentlemen, you’ve previously heard a statement again from defense counsel for Mr. Fonseca with respect to a situation where he alleged that Estrada refused to take the stand and/or refused to testify. Ladies and gentlemen, this is greatly inappropriate argument. I would caution you to disregard it. I have already advised Mr. Goodman on a number of occasions for inappropriate argument. I’m doing it again. Please disregard his statement. It’s inappropriate.”
 

 During his cross-examination of appellant, Goodman asked if it was not true that appellant refused to testify in the case when Goodman called him as a witness. Appellant objected and a recess was taken. Appellant moved for a mistrial, noting that the same issue had come up in Goodman’s opening statement and had almost resulted in a mistrial at that time. Appellant asked how long the court was going to permit Goodman’s misconduct. The prosecutor stated he agreed Goodman was engaging in misconduct and that it had to stop. He argued, however, no prejudice was done by Goodman’s remarks since appellant was testifying.
 

 The court concluded the question was improper. Goodman cited a federal case
 
 (United States
 
 v.
 
 Whitley
 
 (6th Cir. 1984) 734 F.2d 1129, 1137) for the proposition that while a prosecutor could not comment on the failure of a defendant to testify, a codefendant could. After reading the case, the court stated the case did not stand for the exact proposition asserted by Goodman but was nonetheless “interesting.” The court interpreted the case not to declare questioning by a codefendant concerning an invocation of rights proper but, rather, as saying such questioning did not require the granting of a mistrial.
 

 The court stated it would not grant a mistrial but would advise the jury to disregard the question. Appellant asked Goodman be sanctioned. The court declined, stating in light of the language in the case cited by Goodman there was no basis for sanctions. The court instructed the jury that questions are not evidence and they were to disregard Goodman’s last question.
 

 (2)
 
 Discussion
 

 The Attorney General readily concedes Goodman committed misconduct when he commented on appellant’s invocation of his Fifth Amendment rights when called as a witness at Fonseca’s preliminary hearing. As the Attorney General notes, in
 
 People
 
 v.
 
 Hardy, supra,
 
 2 Cal.4th at page 157, our Supreme Court, almost four years before the trial in this case, stated: “[C]omment by an attorney representing one defendant on the silence of a
 
 *1103
 
 codefendant violates the codefendant’s constitutional right to freedom from adverse comment on his silence at trial. [Citations.]” (See also Evid. Code, §913, subd. (a).)
 

 The Attorney General argues, however, that because the comments were made by counsel for a codefendant and not the prosecutor, because they referred not to silence at trial but at a preliminary hearing and because they were made about a codefendant who testified at trial, they were harmless.
 

 It certainly would have been worse had appellant not testified at trial and Goodman, in closing argument, pointed a finger at him and stated: “There he is, ladies and gentlemen, just sitting there.” It is also true that in many cases, comment by a prosecutor on the silence of a defendant is more damaging than such comment by counsel for a codefendant.
 
 Hardy
 
 explains this is so because given the district attorney’s institutional role, comment by a prosecutor on the failure of a defendant to testify is in all likelihood calculated to encourage the jury to equate silence with guilt.
 
 (People
 
 v.
 
 Hardy, supra,
 
 2 Cal.4th at p. 159.)
 

 In this case, Goodman was offering a theory of defense the core of which was appellant’s guilt. Clearly, the jury would have understood his remarks about appellant’s silence as a suggestion that only one with something to hide would have asserted his right to silence. Goodman used appellant’s sacrosanct invocation of his right to silence as a device to bolster his argument that appellant was what Goodman had told the jury he was, a lying drug dealer. His comments were serious misconduct.
 

 d.
 
 Evidence Ruiz de Chavez Believed Appellant Guilty
 

 Appellant argues Goodman committed misconduct when he asked questions suggesting that his first lawyer believed he was guilty.
 

 (1)
 
 Facts
 

 Appellant called as a witness Attorney Eduardo Rivera. Appellant’s sister had hired Rivera to represent appellant and his wife in the present case. Rivera eventually represented only appellant’s wife. Rivera testified to several matters related to Fonseca’s relationship with Ruiz de Chavez.
 

 During his cross-examination of Rivera, Goodman asked about conversations between Ruiz de Chavez and Rivera when they were representing appellant and his wife early in the case. The following exchange appears in the reporter’s transcript:
 

 
 *1104
 
 “Q: And isn’t it true that Mr. Ruiz de Chavez in that conversation made the comment—
 

 “[Prosecutor]: Objection as to relevance. I don’t like where he is going.
 

 “Mr. Goodman: —that his client—
 

 “[Appellant’s Counsel]: It calls for hearsay, your honor.
 

 “Mr. Goodman: —is—
 

 “The Court: Just a minute, Mr. Goodman. All right.
 

 “Mr. Goodman: —guilty of this crime?”
 

 The court immediately sent the jury from the room and, noting three people were speaking at the same time, asked the reporter to reread Goodman’s question. It appears the reporter was unable to fully repeat the question. The court stated it hoped the jury had not heard what Goodman said. The court asked Goodman what was the question he asked. Goodman stated the question he tried to ask was: “Isn’t it true that Mr. Ruiz de Chavez indicated to [Rivera] that Ruiz de Chavez’ client, Estrada, admitted his guilt in this crime.” Goodman added any attorney-client privilege between appellant and Ruiz de Chavez had been waived.
 
 [2]
 

 The court stated it was afraid that was the question Goodman asked. Appellant stated that if the jury heard the question, he was asking for a mistrial. The prosecutor stated he did not believe the jury heard the question given the fact all three attorneys were talking at the same time and that the reporter had been unable to take down the question. The prosecutor stated, however, that Goodman had engaged in similar behavior throughout the trial and the court had done nothing about it.
 

 Noting the reporter had been unable to report the question, the court stated it did not believe the jury heard it. The court told Goodman that during his earlier questionable behavior it was prepared to accept his representations he was acting in good faith. The court stated it now had its doubts and that Goodman’s conduct was bordering on the contemptuous. The court stated it would not grant a mistrial because it did not believe the jury had heard the question. The court told Goodman if he engaged in similar conduct in the
 
 *1105
 
 future, it would take appropriate action. The court told Goodman it did not believe he was doing his client any good.
 

 Goodman stated he believed the question was proper since appellant called Rivera and asked questions about what Ruiz de Chavez had stated Estrada told him. The court stated it disagreed. The court told Goodman it was concerned with his attempts to inflame the jury.
 

 The Attorney General concedes Goodman’s question called for inadmissible evidence since an attorney’s opinion of his client’s guilt is irrelevant. (See
 
 People
 
 v.
 
 Bell
 
 (1989) 49 Cal.3d 502, 537-539 [262 Cal.Rptr. 1, 778 P.2d 129].) The Attorney General argues assuming that the asking of the question was misconduct and assuming it was heard by the jury, it was nonprejudicial. He notes no answer was given and argues that in any case Ruiz de Chavez was not a credible witness and the jury would not have believed a word he said.
 

 (2)
 
 Discussion
 

 Goodman’s question was improper. It suggested that appellant’s own attorney, privy to information from appellant himself, believed his client was guilty. The difficulty is that it is unclear any juror heard the question. The trial court did not inquire and appellant did not request jurors be questioned. Given appellant’s failure to so request, we will not assume the jurors heard Goodman’s improper and prejudicical question.
 

 e.
 
 Improper Use of Appellant’s Prior Convictions
 

 The trial court allowed admission of appellant’s two prior convictions for the purpose of impeachment. During opening statement, trial and argument, Goodman repeatedly cited the prior convictions to show appellant’s propensity to commit crimes like those in the present case.
 

 The Attorney General concedes some of Goodman’s remarks and questions in this regard were improper while urging others were not. In any case, he argues no objection was made to them on the ground advanced now on appeal.
 

 Many of Goodman’s remarks concerning appellant’s prior convictions were highly improper. For the reasons noted above, under the unique circumstances of this case we do not treat appellant’s failure to object as a waiver and will consider Goodman’s misconduct concerning the use of appellant’s priors in evaluating the effect of his misconduct on appellant’s trial.
 

 
 *1106
 
 f.
 
 Suggestion Appellant’s Counsel Did Not Believe Him
 

 During closing argument, Goodman argued: “Now you get the testimony of [appellant] and [his attorney] is I don’t really think he argued that you should believe his client. I didn’t really hear that he attacked everyone else but he never really said that his client should be believed. And I think the answer to that is that an attorney should not allow his client to testify if the attorney knows that the client is going to commit perjury, but sometimes it can’t be prevented if the client insists on it.
 

 “However, if that does occur, if you can’t talk your client . . . out of getting up there and committing perjury, yeah, he has a right to testify at his own trial, the right to get up there and commit perjury, but one thing that the attorney definitely cannot do is argue the credibility of his witnesses, his client, when he, the attorney, knows that the client has committed perjury. And that’s basically what occurred here.”
 

 The Attorney General argues the comments may have been misconduct but states they were brief, counsel had argued appellant should have been believed and, in any case, no objection was made to them.
 

 The remarks were highly improper, suggesting that by the form of his argument appellant’s counsel had signaled to the jury he believed appellant committed perjury. For the reasons noted above, we choose not to treat appellant’s failure to object as a waiver of this issue on appeal.
 
 [3]
 

 3.
 
 Discussion
 

 We join with appellant’s trial counsel, the prosecutor and trial judge in noting that we have never seen a display of misconduct rivaling that of Goodman in this case. Whatever his motivation, he did everything in his power, ethical and otherwise, to destroy appellant’s credibility. Goodman’s comments concerning appellant’s prior arrests, his suggestion that other evidence not presented at trial showed appellant’s guilt, his suggestion appellant’s failure to testify at Fonseca’s preliminary hearing was relevant to his credibility, his use of appellant’s prior convictions to suggest appellant had a propensity to commit crimes, and his suggestion appellant’s own attorney did not believe him were all highly improper.
 

 We conclude Goodman’s acts of misconduct, inadequately checked by the trial court, were so egregious they infected the trial with such unfairness they
 
 *1107
 
 denied appellant due process. (See
 
 People
 
 v.
 
 Padilla, supra,
 
 11 Cal.4th at p. 939.) Appellant’s credibility was central to his defense. Goodman’s misconduct unfairly and seriously undermined that credibility. While the evidence against appellant was strong, we cannot say beyond a reasonable doubt that Goodman’s misconduct did not contribute to the verdict.
 
 (Chapman
 
 v.
 
 California
 
 (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065].) We reverse.
 

 B.
 
 Confidential Informant
 

 *
 

 The judgment is reversed.
 

 Kremer, P. J., and McIntyre, J., concurred.
 

 [2]
 

 Given that the reporter was unable when asked by the court to repeat the entire question asked by Goodman, we can only assume the reporter filled in the missing portions of the question after Goodman stated it to the court.
 

 [3]
 

 As appellant notes, Goodman also committed misconduct by attacking the ethics of appellant’s attorney during closing argument.
 

 *
 

 See footnote 1,
 
 ante,
 
 page 1090.