Filed 6/30/15  P. v. Brown CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D065711 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN247064) |
| ADAM JAMES BROWN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Harry M. Elias, Judge.  Reversed.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Amanda E. Casillas, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Adam James Brown of first degree murder (Pen. Code,[1] § 187, subd. (a)) and found true that he personally used a deadly weapon (a knife) in the commission of the murder (§ 12022, subd. (b)(1)). After the trial court declared a mistrial at the sanity phase of the trial, a new jury found that Brown was insane when he committed the murder.

The court committed Brown to Patton State Hospital and sentenced him pursuant to section 1026 with the term of confinement fixed to 25 years to life plus one year.

Brown appeals, contending the prosecutor committed prejudicial misconduct during closing argument by repeatedly misstating the legal standard to be applied in deciding whether provocation was legally sufficient to constitute heat of passion voluntary manslaughter. We agree, and thus, reverse the judgment.

FACTUAL BACKGROUND

Beginning in 2003, Brown lived with his mother, Leonore Brown (Leonore), and her significant other, Edward Gibbs, in Oceanside, and they continued to live together for five years, until Leonore was killed. Leonore was practically bedridden and required near constant care. She was on medication and experienced considerable pain on a daily basis. Brown cared for his mother. He got her meals, helped her take showers, helped her use the portable toilet, cleaned her toilet, and took care of most of his mother's other needs around the clock. Brown and his mother did not argue or raise their voices at each other. In all, Brown was very responsive to his mother's needs and treated her well.

---

[1]      Statutory references are to the Penal Code unless otherwise specified.

On the morning of June 8, 2008, after receiving his monthly social security check, Gibbs left home to gamble for a few days, as was his usual monthly practice. Gibbs's players card showed that he gambled all day on June 8 and 9 at Pala Casino.

After spending the night at a hotel in Oceanside on June 8, 2008, Brown went to the Hall of Justice in downtown San Diego on June 9, 2008. He informed a deputy sheriff at the Hall of Justice that he was there because a judge who shot him worked there. Brown also told the deputy that about 7:00 p.m. on June 8, 2008, he stabbed his mother with a knife, and the knife was still in her body. Brown claimed that he killed his mother because "she was talking on behalf of somebody who shot him." He said he killed her in the master bedroom of their home and that her body was still there. Brown told the deputy that the key to the master bedroom was on a table inside his bedroom.

City of Oceanside police officers were sent to Brown's home to do a welfare check. Nobody responded at the home, so the officers entered through a window. The officers found Leonore's body on the bed in the master bedroom, which was locked. Her legs were dangling off of the edge of the bed, and her feet were touching the ground. There was also a pool of blood under her head and around her body. A knife was protruding from her face, near her right eye. The blade of the knife was about three and one half inches deep inside of her head, and it was embedded in her skull. The blade cut through her carotid artery twice, causing her death. She also had six other knife-inflicted injuries: three stab wounds, including one that went through her earlobe and another that penetrated her scalp; and three cuts near her left ear. In addition, Leonore had defensive wounds on her hands, which were consistent with her trying to grab the knife.

3

Police found a crossword puzzle near Leonore's feet. Her glasses were near her left shoulder, and there was a pen under her body.

The officers later found the master bedroom key on a shelf inside Brown's bedroom. The officers also found Brown's bloody shirt in his bedroom. The blood on the shirt matched Leonore's DNA profile with a frequency of 1 in 13 quintillion. Additionally, the officers discovered that the knife Brown used was taken from a block of knives in the kitchen.

## DISCUSSION

### I

### *PROSECUTORIAL MISCONDUCT*

Brown contends the prosecutor committed prejudicial misconduct by repeatedly misstating the legal standard to be applied in deciding whether provocation was legally sufficient to constitute heat of passion. The People concede that the prosecutor misstated the law, but assert Brown was not prejudiced.

### A. Background

Prior to closing arguments, Brown's counsel requested that the trial court instruct the jury on heat of passion voluntary manslaughter as a lesser included offense. The prosecution objected, arguing that there was no evidence to support the instruction. Brown's counsel asserted that Brown's statement explaining why he killed his mother and the inference that there was no other motive for the killing supported the instruction. The court determined that the jury could infer provocation based on the evidence presented at trial: "I think the content of [Brown's] statement to the deputy at the Hall of Justice is a

4

fact upon which the jury, should they decide could raise -- create an inference that there was some sort of provocation." Therefore, the trial court instructed the jury on first degree murder, second degree murder, and heat of passion voluntary manslaughter.[2] The trial court also instructed the jury that they were to follow the law as the court explained it, even if they believed an attorney's comments conflicted with the court's instructions.

During closing argument, the prosecutor told the jury that the standard for provocation in heat of passion voluntary manslaughter requires the jury to find that an average reasonable person would have acted the "very same way" Brown did. Brown's counsel objected, arguing that the prosecutor misstated the law. The trial court did not rule on the objection, but told the jury, "Ladies and gentlemen, the instruction gives you the format in which you are to analyze the elements. That's the law you're supposed to follow."

While still discussing provocation, the prosecutor later argued that the provocation must be "so terrible that reasonable person in that situation would have also killed." The prosecutor continued with similar statements throughout her closing argument:

> "There has to be an element of Leonore Brown provoking Adam into that extremely murderous rage in which an average reasonable person would have killed, too."
>
> ***
>
> "Leonore Brown has to provoke Adam Brown in such a way that heat of passion clouded his every judgment and an average reasonable person would have also killed. . . . Leonore Brown did

---

[2] There is no contention that the jury instructions were not proper as given.

not provoke Adam Brown in such a way that he had to stab her multiple times."

\*\*\*

"Where is the provocation? . . . There has to be provocation that is so passionate that he could not do anything but to stab her four different times."

During this argument, the prosecutor used a power point slide that said, "show me provocation." Brown's counsel objected to the use of the slide. The court responded by informing the jury, "Well, again, ladies and gentlemen, this is argument. Each lawyer is going to tell you their perspective, how they interpret the facts and how they think you should interpret the facts as relates to the law. You are the ultimate judges of what factually occurred. The law you follow is going to be in this brown book, and that's your obligation."

Outside of the presence of the jury, Brown's counsel moved for a mistrial, arguing that the People improperly shifted the burden of proof to the defendant by using the slide that stated "show me provocation" and by implying that voluntary manslaughter provided a "license to kill." Brown's counsel emphasized that the prosecutor misstated the law. The court overruled the motion, finding that the court's admonishments and instructions provided the correct law to the jury, and there was no reason for the court to believe the jury would deviate from the instructions.

In closing argument, Brown's counsel argued that the prosecution had the burden of proving the absence of a sudden quarrel or heat of passion. He also asserted that voluntary manslaughter is not a justified killing. Brown's counsel focused on his primary

6

defense in the case that Brown was provoked and responded rashly, stabbing his mother: "In deciding whether the provocation was sufficient, consider whether a person of average disposition -- and that's what it is, average disposition -- in the same situation. Well, when it says in the same situation, it means the 24 hour a day, seven day a week care for his ailing mother where, I don't know, is he sleeping a lot? Is he happy with it? Is he getting tired with it? Is his mom complaining? Is she saying things to him?"

In rebuttal, the prosecutor argued that the evidence was insufficient to show provocation, which would have driven an average person to act "exactly" as Brown did. Brown's counsel objected again, and the trial court overruled the objection and told the jury to "follow the instructions. You decide the facts."

## B.  Analysis

Brown asserts the prosecutor committed misconduct during her closing argument by repeatedly misstating the law and shifting the burden of proof. The People concede that the prosecutor misstated the law regarding the requirements of provocation, but denies that the burden of proof was shifted or that Brown was prejudiced.

We agree the prosecutor committed misconduct by misstating the law regarding the proper standard for assessing the legal sufficiency of provocation. In *People v. Beltran* (2013) 56 Cal.4th 935 (*Beltran*), the California Supreme Court explained that heat of passion is a state of mind that "precludes the formation of malice and reduces an unlawful killing from murder to manslaughter," and heat of passion is "caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of

7

unconsidered reaction to the provocation." (*Beltran*, *supra*, at p. 942.) The court explained:

> "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to kill focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply react, without reflection. To satisfy [the proper standard], the anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would act in a certain way: to kill. Instead, the question is whether the average person would react in a certain way: with his reason and judgment obscured." (*Id.* at p. 949; italics omitted.)

The court further clarified that, under the proper standard, "[p]rovocation is adequate only when it would render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*Beltran*, *supra*, 56 Cal.4th at p. 957, quoting *People v. Logan* (1917) 175 Cal. 45, 49.) The Supreme Court rejected the Attorney General's argument in that case that the proper standard for assessing the adequacy of provocation is whether an ordinary person of average disposition would be moved to kill. (*Beltran*, *supra*, at pp. 946, 949.)

Here, the prosecutor misstated the law by essentially arguing, like the prosecutor in *Beltran, supra,* 56 Cal.4th 935, that the proper standard for assessing the adequacy of provocation is whether an ordinary person of average disposition would be moved to kill. Indeed, the prosecutor went so far as to tell the jury, not only would an ordinary person be moved to kill, but would also have stabbed the victim four times. By misstating the

8

law, as the parties correctly acknowledge, the prosecutor in this case committed misconduct. (*People v. Boyette* (2002) 29 Cal.4th 381, 435 ["[I]t is misconduct for the prosecutor to misstate the applicable law."].)

Similarly, in consideration with the prosecutor's consistent misstatements of the law, we also are very concerned with the slide stating, "show me provocation" and its impact on the jury. This slide implies that it is not the prosecution that needs to prove a lack of provocation beyond a reasonable doubt, but Brown who must prove provocation. Showing this slide while misstating the applicable law further exacerbated the prosecutorial misconduct.

Having concluded that the prosecutor committed misconduct, we next must determine whether reversal is warranted. A prosecutor's remarks can " ' "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." ' " (*People v. Frye* (1998) 18 Cal.4th 894, 969.) In such cases, the misconduct amounts to federal constitutional error and reversal is required unless we conclude the misconduct was harmless beyond a reasonable doubt. (*People v. Estrada* (1998) 63 Cal.App.4th 1090, 1106-1107, citing *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) If the prosecutor's remarks did not rise to that level, we will not reverse unless we conclude it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the misconduct. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133, citing *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) Under either standard, we must reverse the judgment in this matter.

9

Here, the crux of Brown's defense was that he was provoked and responded by killing his mother. His attorney stressed there was no motive whatsoever for the killing. He presented evidence that Brown loved and cared for his mother, who was practically bedridden, on a lot of medications, and was in considerable pain. Brown cared for his mother by getting her meals, helping her take showers, helping her use the portable toilet, cleaning her toilet, and taking care of most of her other needs around the clock. There was evidence presented that Brown and his mother did not argue or raise their voices at each other. In all, Brown was very responsive to his mother's needs and treated her well.

Against this back drop, Brown's counsel argued that Brown must have been provoked before he killed his mother. To this end, Brown's counsel argued that Brown was stressed from having to care nonstop for his dying mother. He reminded the jury that Brown said he killed his mother because "she was talking on behalf of somebody who shot him." Also, Brown's counsel stressed the way in which Leonore was killed as evidence that Brown was provoked. He stabbed her with a knife multiple times. Brown's counsel maintained the method of the killing indicated that Brown was acting "rashly and without due deliberation, that is from passion rather than judgment."

In countering Brown's defense theory, the prosecutor argued there was no evidence to support the defense's theory of provocation. However, she also consistently misstated the law throughout closing argument and the trial court explicitly or implicitly overruled all of Brown's counsel's objections to the misstatements. Therefore, the jury reasonably could have concluded that the evidence of provocation had to show that a reasonable person would have killed Leonore if under the same circumstances as Brown

10

faced. In light of the fact that Brown's only real defense in this case was provocation and the trial court believed sufficient evidence existed that a heat of passion voluntary manslaughter instruction should be given, we cannot conclude the misconduct was harmless beyond a reasonable doubt.

Based on the record before us, we also conclude it is reasonably probable that a result more favorable to Brown would have been reached in the absence of the misconduct. Our high court has emphasized "that a 'probability' in this context does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility. ([*Watson*, *supra*, 46 Cal.2d] at p. 837; cf. *Strickland v. Washington* (1984) 466 U.S. 668, 693-694, 697, 698 ['reasonable probability' does not mean 'more likely than not,' but merely 'probability sufficient to undermine confidence in the outcome'].)" (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715; italics omitted.) A more favorable outcome under this analysis includes a hung jury. (Cf. *People v. Soojian* (2011) 190 Cal.App.4th 491, 519-521.)

Here, the jury heard several times during closing argument the wrong legal standard to be applied in deciding whether provocation was legally sufficient to constitute heat of passion. Moreover, despite multiple objections by Brown's counsel, the court allowed these misstatements. Citing *Beltran*, *supra*, 56 Cal.4th 935, the People argue there is no prejudice because the record does not demonstrate that the jury was confused. The People's reliance on *Beltran* is misplaced on this point.

In *Beltran*, *supra*, 56 Cal.4th 935, the jury asked a question regarding provocation and the court correctly responded:

"The jury asked for additional guidance and the trial court gave it. It was not reasonably probable that the jury here was misled to defendant's detriment. Although counsel's argument may have created ambiguity about the nature of sufficient provocation, the jury directly requested clarification of the standard. The jury's note pinpointed the issue, inquiring if it should consider whether an ordinary person would 'commit the same crime (homicide) or can it be other, less severe, rash acts.' The trial court responded with a correct statement of law, that '[t]he provocation involved must be such as to cause a person of average disposition in the same situation and knowing the same facts to do an act rashly and under the influence of such intense emotion *that his judgment or reasoning process was obscured.*' (Italics added.) This response properly refocused the jury on the relevant mental state, properly set out in CALCRIM No. 570, and away from whether an ordinary person of average disposition would kill in light of the provocation. Because of the trial court's clarifying instruction, it was not reasonably probable that any possible ambiguity engendered by counsel's argument misled the jury." (*Beltran*, *supra*, at pp. 955-956.)

In contrast to *Beltran*, here the jury made no inquiry regarding heat of passion, and thus, the court did not respond by directing the jury to or otherwise reinforcing the heat of passion voluntary manslaughter jury instruction. At best, the court referred the jury to the jury instructions in general, but did so without sustaining any of Brown's counsel's objections to the prosecutor's misstatements of the law. As such, the jury reasonably could have been led to believe, by the trial court's tacit approval of the prosecutor's statements during closing argument, that it could only find provocation if it determined that a reasonable person under Brown's circumstances would have killed Leonore. This is not correct, and the trial court here took no corrective action. (See *Beltran*, *supra*, 56 Cal.4th at pp. 949, 955-956.)

Finally, the People argue there was not sufficient evidence of provocation in any event. We disagree. There was enough evidence that the trial court believed a

12

manslaughter instruction was warranted. Further, provocation was Brown's only defense at trial. As set forth above, we conclude there was evidence to support Brown's theory. Based on this evidence and the prosecutor's misconduct (approved by the trial court) we cannot say that there is no reasonable chance that at least one juror could have found Brown was provoked. (See *Watson*, *supra*, 46 Cal.2d at p. 837; cf. *People v. Soojian*, *supra*, 190 Cal.App.4th at pp. 519-521.) Simply put, the prosecutorial misconduct coupled with the trial court's tacit approval of same sufficiently undermines our confidence in the outcome of this matter. (See *College Hospital, Inc. v. Superior Court*, *supra*, 8 Cal.4th at p. 715.) Therefore, we must reverse the judgment.

## DISPOSITION

The judgment is reversed.

HUFFMAN, Acting P. J.

WE CONCUR:

McINTYRE, J.

O'ROURKE, J.

13