Filed 5/28/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B298946 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA436832) |
| v. | |
| DAVON RAYDALE THOMAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Stephen A. Marcus, Judge.  Affirmed in part, reversed in part.

C. Matthew Missakian, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithy, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

The defendant and appellant Davon Raydale Thomas, along with codefendants Aaron Cleveland, Orlando Dalman Ritchie, and Kenshan Aorian Lenoir, were tried for murder in violation of Penal Code section 187, subdivision (a),[1] shooting at an inhabited dwelling, in violation of section 246, and felony evading in violation of Vehicle Code section 2800.3, subdivision (a). The jury convicted Thomas on all counts and found the gang allegation under section 186.22, subdivision (b) true for the shooting at an inhabited dwelling charge. As for the codefendants, the jury was unable to reach a verdict on the murder charge but convicted each on the shooting at an inhabited dwelling count finding the gang allegation true. The jury also convicted Ritchie and Lenoir on the felony evading and Cleveland, on the lesser charge of misdemeanor evading. The trial court sentenced Thomas to 25 years to life for the murder, 15 years to life for the shooting at an inhabited dwelling, and seven years for the felony evading, to be served consecutively.

On appeal, Thomas raises seven contentions: (1) the trial court erroneously denied his new trial motion because prior to the sentencing, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (SB 1437) rendered his felony-murder conviction invalid, (2) the trial court committed instructional error on the accomplice/codefendant instruction improperly suggesting his testimony should be viewed with caution, (3) the prosecutor committed misconduct by lessening the reasonable doubt standard in closing argument, (4) counsel for codefendant Cleveland committed various misconduct which denied him due process of law, (5) the trial court violated his due process right by

---

[1] All further undesignated section references are to the Penal Code.

2

denying his motion to sever, (6) the trial court committed error by excluding his gang territory evidence, and, (7) the prejudice caused by the cumulative error denied him due process of law. We find merit in Thomas's SB 1437 contention and reverse the murder conviction. We affirm the judgments on the remaining counts.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Prosecution's Case*

The prosecution's case was based on three separate incidents all committed on May 23, 2015.

### *The Shooting at an Inhabited Dwelling Incident*

The shooting occurred at the home of Qiana Beverly located on 70th Street near Budlong Avenue in the city of Los Angeles. Beverly lived with a friend named Shannon Ruffinelli. That night Beverly hosted a party for her son with about 100 people in attendance. Just prior to midnight, Beverly heard several gunshots. Everyone ran. Beverly saw a black Honda drive away from the location.

Marlen and Jose Leiva are siblings who lived near the corner of 70th Street and Budlong Avenue. Marlen saw a person get out of a car and shoot approximately five times towards a house. She described the shooter as an African American male, between the age of 16 and 22, thin, and wearing loose dark clothing. Marlen thought the shooter yelled, "Eight Trey Gangster Crips."

Jose saw four people get out of a car and start shooting towards the party. He called 9-1-1. The shooters got back into the car and drove away. In the 9-1-1 call, Jose described the car as a black 2014 Chevy Impala.

3

***The Murder Incident***

Eric Cousin lived near 52nd Street and Western Avenue in the city of Los Angeles. Just after midnight, he walked to the side of his house to see why his dog was barking. He saw two men pressing the victim, Jonathan Ford, against a chain link fence. The two men held Ford and demanded he "hurry up" and told him to "give it up nigga." Another man wearing black clothing got out of a car, approached Ford, and shot him. The assailants got back in the car and drove away. Cousin called 9-1-1.

When Los Angeles Police Officer Christopher Tabela and his partner arrived around 12:10 a.m., he saw Ford lying on the ground already deceased. Ford had a gunshot wound to his head and right shoulder/chest area.

***The Evading Incident***

Around 12:12 a.m., Los Angeles Police Officer Julio Aguilar and his partner were driving in a marked police vehicle southbound on Western Avenue towards Martin Luther King Jr. Boulevard. He saw a black Chevy Cruze driving fast in the opposite direction. He made a u-turn to follow it. The Chevy Cruze drove into a residential area and reached speeds of 70 to 90 miles per hour running stop signs and red lights. As the Chevy Cruze turned onto 39th Place, Officer Aguilar observed a handgun being tossed from the passenger side.

Officer Aguilar activated his emergency lights and siren. As he pursued, the Chevy Cruze continued to run stop signs and red lights reaching speeds around 100 miles per hour. At the intersection of 2nd Avenue and 39th Street, the Chevy Cruze collided into a White Prius and came to a stop.

4

Cleveland climbed out of the passenger side and ran. Thomas, along with Ritchie and Lenoir remained at the car and were arrested. With the assistance of a helicopter, Cleveland was apprehended after breaking into a stranger's home to hide. Thomas had been in the driver's seat.

A passenger of the Prius was ejected from the collision and suffered several injuries. He required two eye surgeries, had pain in his right knee and struggled to walk for a few months after the crash.

### The Physical Evidence

Physical evidence collected from the Chevy Cruze consisted of the following: (1) a loaded (one live bullet and two expended casings) .38-caliber Rossi revolver found on the driver's side rear seat, (2) a number of .40-caliber live rounds (Smith & Wesson and TUI brands) from various parts of the car, (3) one expended .38-caliber casing, on the left rear seat, (4) a blue suitcase containing a box of 10 live Hornady brand .38-caliber bullets, (5) Ford's cell phone on the passenger seat, (6) cell phones belonging to Thomas, Ritchie and Lenoir, and (7) a possible bullet impact mark on the ceiling's upholstery.

From Lenoir's pants pocket, the police recovered a Glock model 22, .40-caliber pistol loaded with seven live rounds.

Near the location where Cleveland had run after the crash, the police recovered six .38-caliber expended casings of various brands (Hornady, GFL, and Winchester).

Near the location where Officer Aguilar had observed a gun being tossed from the Chevy Cruze, the police recovered a Taurus revolver loaded with six live .38-caliber Hornady brand bullets.

At or near Beverly's home, the police recovered: (1) one spent bullet on a bedroom floor of Beverly's home, (2) several

bullet marks on the exterior of Beverly's home, (3) a spent bullet found in the front of the next door home, and (4) six .40-caliber expended casings on 70th Street.

From the autopsy, two spent bullets were recovered from Ford's body.

### The Scientific Evidence

Criminalists conducted firearms tests with the recovered physical evidence. Criminalists opined as follows:

(1)     The Rossi had fired the bullets that killed Ford.

(2)     Neither the Glock nor the Taurus was the murder weapon.

(3)     The Rossi had fired the six .38-caliber expended casings found near the location where Cleveland had run after the crash.

(4)     The Glock had fired the six .40-caliber expended casings on 70th Street.

### The Prosecution's Gang Evidence

The prosecution presented several gang experts including Detective Marlon Prodigalidad and Officer Michael Barragan of the Los Angeles Police Department. Prodigalidad opined that Thomas, Cleveland, and Lenoir are members of Eight Trey Gangster Crips and that Ritchie is a member of Hoovers. Both Prodigalidad and Barragan opined, Eight Trey Gangster Crips and Hoovers are allies and consider Neighborhood Crips a common enemy.

On gang territory, both Barragan and Prodigalidad opined Beverly's home near the corner of Budlong Avenue and 70th Street is located in Neighborhood Crips' gang territory, although some law enforcement created gang maps say otherwise. They

both opined the shooting at Beverly's home was for the benefit of, and, in association with, a criminal street gang.

### The Defense Case

Thomas, Ritchie, and Lenoir took the stand to testify. Cleveland did not.

### Thomas's Testimony

Thomas grew up in Eight Trey Gangster Crips' territory and hung out with them since about 14 or 15 years old. He was never officially "jumped-in." Thomas and Ritchie are childhood friends. He met Lenoir through his younger brother. Thomas made money from high school to the present time by selling drugs. He moved to Las Vegas, Nevada in 2013.

The day before the incidents, on May 22, 2015, Thomas drove to Los Angeles with Ritchie and Lenoir to conduct a drug transaction as a middleman. Thomas went to an apartment building on 79th Street and Normandie to buy Xanax. While there, he saw Cleveland who asked for a ride. Thomas had met Cleveland once before years prior.

When Thomas drove the vehicle, Ritchie sat in the front passenger seat, Lenoir sat behind Thomas who drove, and Cleveland sat behind Ritchie. When Thomas got to 70th Street, he heard gunshots real close but did not know where the shots were coming from. Cleveland yelled, "Let me out, go back, or something." Cleveland got out of the car and started shooting. No one else fired a gun.

Cleveland got back into the car. Everyone was arguing. Thomas stopped the car to calm down and to confront Cleveland on what he had done. Cleveland got out of the car with a gun in hand. Thomas saw him grab Ford telling him to "give up something." He saw Cleveland shoot Ford two times, once to the

7

head, the other to the chest. Thomas drove away with all four in the car.

As Thomas sped away from the location, he noticed a police vehicle behind him. Chaos ensued in the car with everyone yelling. Thomas threw the Taurus revolver out of the window.

**Ritchie's Testimony**

Ritchie was a member of Hoovers when he was younger. Around 2014, he moved to Las Vegas and worked as a pimp.

Ritchie drove to Los Angeles with Thomas and Lenoir. He was going to see his mother. The three stopped at an apartment to buy Xanax where they saw Cleveland. Cleveland asked for a ride in exchange for $10. This was the first Ritchie had ever met Cleveland.

Cleveland directed Thomas where to drive. When the car stopped, Ritchie saw Cleveland get out of the car. Ritchie heard gunshots. Thomas drove away after Cleveland got back into the car.

After several minutes of driving, Thomas stopped the car. Cleveland got out of the car first, followed by Thomas. Ritchie heard Thomas try to stop Cleveland, but Cleveland shot Ford.

**Lenoir's Testimony**

Lenoir grew up in Eight Trey Gangster Crips territory but claimed he was not a gang member.

Lenoir wanted to attend a cousin's party in Los Angeles but missed his flight from Las Vegas. Lenoir knew Thomas was driving to Los Angeles, so he called and got a ride.

When Thomas stopped the car on Budlong Avenue, Lenoir was in the back seat with Cleveland whom he had never met. Lenoir had the Glock for self-protection. Cleveland grabbed Lenoir's Glock from his lap, got out of the car, and shot the gun.

Cleveland yelled, "Fuck Naps," a derogatory term for Neighborhood Crips.

When Ford was killed, Lenoir never got out of the car. Lenoir saw Cleveland walk up on Ford. He saw Cleveland shoot Ford but only the second shot.

### The Defense Gang Evidence

Thomas called Alex Alonso to testify about gang culture. Alonso is a professor at Cal State Long Beach in Chicano Latino Studies. His master's thesis was about the territoriality of African American street gangs in Los Angeles. He opined Eight Trey Gangster Crips and Neighborhood Crips are rivals.

Alonso opined that the city block between Budlong and Raymond Avenue on 70th Street in Los Angeles has been claimed by Eight Trey Gangster Crip for around 40 years and is not Neighborhood Crips territory.

## DISCUSSION

## I. The Denial of a New Trial Motion after the Effective Date of SB 1437

Thomas contends the trial court's denial of his new trial motion on the murder conviction was erroneous because prior to the sentencing date, SB 1437 took effect and rendered his felony murder conviction invalid. He then argues broadly that the *Estrada* rule[2] should apply to all non-final judgments but at a

---

[2] The oft cited *Estrada* rule states, "where the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed." (*In re Estrada* (1965) 63 Cal.2d 740, 748.) When applicable, the *Estrada* rule applies to all non-final judgments. (*Id*. at p. 744.) "The rule in *Estrada* has been applied to statutes governing penalty enhancements, as well as to

9

minimum to himself because he was sentenced after the new law took effect. Although Thomas mentions "non-final judgments" as a class, his arguments are focused on the sub-category within that class of those who were convicted before the effective date but not sentenced until after. In any event, the broader question was settled by our Supreme Court in *People v. Gentile* (2020) 10 Cal.5th 830 (*Gentile*). Left untouched is the issue of first impression before us – whether a defendant convicted of felony murder prior to SB 1437's effective date but sentenced after - must seek relief under section 1170.95. We agree that Thomas is correct.

### A.    Relevant Proceeding

The prosecution relied on two theories to establish first degree murder liability:  (1) the felony murder rule, and, (2) the theory under willful, deliberate premeditation. On the felony murder rule the trial court did not instruct the jury to consider the question of "major participant" or "reckless indifference to human life" since the prosecution had not filed a special circumstance allegation pursuant to section 190.2, subdivisions (a)(17) and (d).[3]

On August 29, 2018 before SB 1437 took effect on January 1, 2019, the jury convicted Thomas on the murder

---

statutes governing substantive offenses.  [Citations.]"  (*People v. Nasalga* (1996) 12 Cal.4th 784, 792-793.)

[3]    Prior to SB 1437, proving up the elements of being a "major participant" and having the mental state of "reckless indifference to human life" were only relevant for the special circumstance allegation under this provision of law.

charge, as well as the other two counts.[4]  Presumably because the Legislature was close to passing SB 1437, the trial court modified the guilty verdict form and caused the jury to specify the theory of liability on which they relied.  The jury filled out the guilty verdict form with a "true" finding on felony murder and a "not true" finding on premeditation.

After the verdict, Thomas waived time and continued the matter for sentencing to October 4, 2018.  On October 4, 2018, the parties stipulated to continue the sentencing to October 16, 2018.  On October 16, 2018, Thomas again waived time and continued the sentencing to January 31, 2019 beyond the effective date of SB 1437.  On January 31, 2019, Thomas again sought a continuance of his sentencing which was granted to March 15, 2019.

On February 21, 2019, Thomas filed a motion for a new trial challenging the conviction on the murder charge.  In it, the trial counsel contended:

"At this point, this Court has only two [c]onstitutionally permissible options in regards to Count 1 for Mr. Thomas: 1) the Court can dismiss the murder charge and impose a sentence for robbery, or 2) order a new trial for Thomas as to Count 1 so that a jury can be properly instructed on the elements of first-degree felony murder.  Since Mr. Thomas has not been sentenced, the specific procedures within SB 1437 that allow a sentenced offender to seek a re-sentencing do not currently apply to Mr. Thomas."

---

[4]     The California Legislature passed SB 1437 in 2018, and the bill was signed by the Governor on September 30, 2018.  As a bill enacted at a regular session, the bill became effective on January 1, 2019.  (See Cal. Const., art. IV, § 8, subd. (c)(1).)

On April 19, 2019, counsel for Thomas filed a supplemental new trial motion. Trial counsel contended "there is no precedent that allows this Court to impose sentence in such an unusual and extra-ordinary [*sic*] way. Imposing a sentence for first-degree murder on Mr. Thomas would be completely contradictory to the intent of SB 1437."

On April 25, 2019, the trial court heard the new trial motion. After hearing from counsel for Thomas and the prosecutor, the trial court reasoned section 1170.95 required a person to be convicted before relief may be granted. The trial court ruled, "But right now it is the Court's position, because [Thomas] must be convicted, and conviction involves actual sentencing, that's when a judgment occurs, he is not allowed . . . to get the benefits of 1437."

### B. Legal Principles

#### 1. *SB 1437*

SB 1437 amended sections 188 and 189, and, added section 1170.95 creating a retroactive petition procedure similar to Proposition 36 and Proposition 47.[5]

---

[5] Proposition 36, also known as the "Changes to Three Strikes Sentencing Initiative" amended California's "Three Strikes" law to limit the application of the "third-strike" life sentences to only those cases where the new alleged crime constituted a serious or a violent felony as defined in California's Penal Code, with exceptions. It also permitted those serving "third-strike" sentences to seek retroactive relief pursuant to a new resentencing procedure under section 1170.126. The voters enacted Proposition 36 on November 7, 2012 and it took effect the following day. (Cal. Const., art. II, § 10, former subd. (a).) Proposition 47, also known as the "The Safe Neighborhoods and Schools Act" reclassified certain drug and theft offenses from a felony to a misdemeanor with exceptions. Like Proposition 36, it

12

According to its author, the legislative purpose of SB 1437 was to "restore proportional responsibility in the application of California's murder statute reserving the harshest punishments for those who intentionally planned or actually committed the killing." (Assem. Com. on Pub. Safety, Rep. on Sen. Bill No. 1437 (2018 Rev. Sess.) p. 4.) SB 1437 eliminated the second-degree murder theory under the natural and probable consequences doctrine (see *Gentile, supra,* 10 Cal.5th at p. 849 ["By limiting murder liability to those principals who personally acted with malice aforethought, section 188(a)(3) eliminates what was the core feature of natural and probable consequences murder liability: the absence of a requirement that the defendant personally possess malice aforethought."]) and narrowed the liability for the first-degree felony murder to: 1) the actual killer, 2) the aider and abettor who intended to kill, and 3) the aider and abettor who was a major participant and acted with reckless indifference to human life. (§ 189, subd. (e)(1)–(3).)

## 2. *Section 1170.95*

SB 1437 also established a retroactive procedure which allows those "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts . . . ." (§ 1170.95, subd. (a).)

Individuals seeking relief must meet three conditions: "(1) A complaint, information, or indictment was filed against the

---

also provided for a new resentencing scheme under section 1170.18. Like Proposition 36, as an initiative statute, it took effect the day after the voter's approval on November 5, 2014.

13

petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[,]  [¶]  (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[, and]  [¶]  (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019."  (§ 1170.95, subd. (a)(1)-(3).)

The petitioner is required to file the petition with the trial court that sentenced the petitioner, along with service on the prosecutorial agency and his/her prior counsel or the county's public defender.  (§ 1170.95, subd. (b)(1).)  The petition must include a declaration by the petitioner setting forth eligibility along with the case number and year of conviction and "[w]hether the petitioner requests the appointment of counsel."  (*Id*., subd. (b)(1)(A)-(C).)

Once the petition is received, the trial court must "determine if the petitioner has made a *prima facie* showing that the petitioner falls within" the retroactive scheme for resentencing.  (§ 1170.95, subd. (c), italics added.)  Prosecutors are required to file a response within 60 days of service of the petition, and, the petitioner may file a reply within 30 days after service of the prosecutor's response.  (*Ibid.*)  "If the petitioner makes a *prima facie* showing that he or she is entitled to relief, the court shall issue an order to show cause."  (*Ibid*., italics added.)

Once the trial court issues an order to show cause, it must hold a hearing within 60 days unless the hearing is extended for good cause.  (§ 1170.95, subd. (d)(1).)  In the hearing, the trial

14

court must determine "whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not been previously . . . sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (*Ibid.*) The parties may waive the hearing and stipulate that the petitioner is eligible for relief in which case the trial court may vacate the murder conviction and move straight to resentencing. (*Id.*, subd. (d)(2).)

At the hearing to determine whether petitioner is eligible for relief, the burden is on the prosecutor to prove ineligibility beyond a reasonable doubt. (§ 1170.95, subd. (d)(3).) "The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (*Ibid.*)

### C. Analysis

"When a new statute decreases the prescribed punishment for criminal conduct, . . . whether the change applies to preenactment conduct is a matter of legislative intent. [Citation.]" (*People v. Lara* (2019) 6 Cal.5th 1128, 1134 (*Lara*).) Neither the state nor the federal Constitutions bar the Legislature from enacting a savings clause or its equivalent to determine how the criminal laws of the state should treat preenactment illegal conduct after the ameliorative statute takes effect. Indeed, "[b]ecause the *Estrada* rule reflects a presumption about legislative intent, rather than a constitutional command, the Legislature . . . may choose to modify, limit, or entirely forbid the retroactive application of ameliorative criminal law amendments if it so chooses." (*People v. Conley* (2016) 63 Cal.4th 646, 656 (*Conley*).)

15

"The fundamental task of statutory construction is to 'ascertain the intent of the lawmakers so as to effectuate the purpose of the law.  [Citations.]  In order to determine this intent, we begin by examining the language of the statute.'  [Citation.]  The words of a statute are to be interpreted in the sense in which they would have been understood at the time of the enactment.  [Citations.]" (*People v. Cruz* (1996) 13 Cal.4th 764, 774-775.)  We consider the language used in a statute as " 'generally . . . the most reliable indicator of legislative intent.' "  (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.)  The plain meaning controls absent ambiguity in the statutory language.  (*Ibid.*)  " '[A] rule of construction . . . is not a straitjacket.  Where the Legislature has not set forth in so many words what it intended, the rule of construction should not be followed blindly in complete disregard of factors that may give a clue to the legislative intent.'  [Citation.]" (*People v. Jones* (1988) 46 Cal.3d 585, 599.)  When two interpretations of a statute stand in relative equipoise, the rule of lenity requires the court to choose the one which favors the defendant.  (*People v. Manzo* (2012) 53 Cal.4th 880, 889.)  However, appellate courts should not strain to interpret a penal statute in a defendant's favor if it can fairly discern a contrary legislative intent.  (*People v. Avery* (2002) 27 Cal.4th 49, 58.)

The Attorney General argues section 1170.95 is the exclusive retroactive remedy, even if the sentencing occurs after SB 1437's effective date, because the Legislature may prescribe specific procedures separate from the *Estrada* rule.

The Attorney General is correct that the Legislature may enact a savings clause or its equivalent to bypass the *Estrada* rule.  In *Conley*, our Supreme Court discussed this legislative (through the voters') choice in the context of Proposition 36 that

16

altered California's Three Strikes sentencing. "The *Estrada* rule rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not. [Citation.] In enacting the recall provision, the voters adopted a different approach. They took the extraordinary step of extending the retroactive benefits of the Act beyond the bounds contemplated by *Estrada*—including even prisoners serving *final* sentences within the Act's ameliorative reach." (*Conley, supra*, 63 Cal.4th at pp. 657-658.) In *People v. Yearwood* (2013) 213 Cal.App.4th 161, the Court of Appeal noted, "[t]he *Estrada* rule does not apply to [Proposition 36's recall provisions] because section 1170.126 operates as the functional equivalent of a savings clause." (*Id.* at p. 172.).

We likewise observe that section 1170.95 may be considered a functional equivalent of a savings clause. The Legislature spelled out with specific details the procedures to be followed by persons convicted and sentenced for murder under the felony murder rule, or, under the doctrine of natural and probable consequences. This approach, as advocated by the Attorney General, and, described in *People v. Martinez* (2019) 31 Cal.App.5th 719 (*Martinez*) as the exclusive remedy for non-final judgments, is certainly true for defendants who were convicted and sentenced prior to SB 1437's effective date. We agree with *Martinez* that "section 1170.95 does not distinguish between persons whose sentences are final and those whose sentences are not. That the Legislature specifically created this mechanism, which facially applies to both final and nonfinal convictions, is a significant indication Senate Bill 1437 should not be applied

17

retroactively to nonfinal convictions on direct appeal." (*Id.* at p. 727.) We also agree with *Martinez* that "[p]roviding the parties with the opportunity to go beyond the original record in the petition process, a step unavailable on direct appeal, is strong evidence the Legislature intended for persons seeking the ameliorative benefits of Senate Bill 1437 to proceed via the petitioning procedure." (*Id.* at p. 728.) After *Martinez* was published, several Courts of Appeal have agreed with its holding. (See *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1147-1158; *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1113-1114, review granted on another issue Nov. 13, 2019, S258175; *People v. Munoz* (2019) 39 Cal.App.5th 738, 751-753, review granted on another issue Nov. 26, 2019, S258234; *People v. Bell* (2020) 48 Cal.App.5th 1, 10-11.) Finally, in *Gentile*, our Supreme Court agreed with these Courts of Appeal that section 1170.95 is the exclusive remedy for retroactive relief on non-final judgments. (*Gentile*, *supra*, 10 Cal.5th at pp. 851-859.)

Whether section 1170.95 applies to defendants convicted prior to the effective date and sentenced after, however, is a narrower and more specific question than the one the *Martinez* line of cases have answered.[6] What matters here is legislative intent. Based on the language used in section 1170.95, persons convicted before SB 1437 took effect whose sentencing hearing is continued beyond the effective date do not fall under section 1170.95.

---

[6] We are unaware of any California decisional law which has dealt with this narrow question. "Cases are not authority for propositions not considered." (*City of Oakland v. Public Employees' Retirement System* (2002) 95 Cal.App.4th 29, 57, [115 Cal.Rptr.2d 151].)

It is a maxim of statutory construction that "Courts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage." (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 22 [56 Cal.Rptr.2d 706, 923 P.2d 1].)  In this analysis, the words used by the Legislature and their knowledge of the effective date sheds light on its legislative intent.

SB 1437 took effect January 1, 2019.  Possessing this knowledge, the Legislature drafted section 1170.95's eligibility requirement to include both the adjudication of guilt and sentencing as of that date.  (§ 1170.95, subd. (a) ["A person convicted of felony murder or murder under a natural and probable consequences theory may file a petition with *the court that sentenced the petitioner* to have the petitioner's murder conviction vacated and to be resentenced." (Italics added.)].)  The clearest indication of legislative intent here is that the Legislature intended section 1170.95 to operate as a post-judgment remedy, and that any person, whether with a final or non-final judgment on January 1, 2019, may challenge their judgment by filing a petition under section 1170.95.

Other aspects of section 1170.95 show it to be a post-judgment remedy.  For example, the petition is to be filed "with the court that *sentenced* the petitioner" and if the sentencing judge is not available, "the presiding judge shall designate another judge to rule on the petition."  (§ 1170.95, subd. (b)(1), italics added.)  "The parties may waive a resentencing hearing and stipulate that the petitioner is eligible to have his or her murder conviction vacated and for resentencing."  (*Id.*, subd. (d)(2).)  The Legislature's choice of words and phrases on eligibility and the specific procedures to be followed show it

considered section 1170.95 to be a post-judgment retroactive remedy on its effective date. As such, section 1170.95 does not apply to persons like Thomas who were not yet sentenced on January 1, 2019.

This case is analogous to *Lara* decided on statutory construction based on the words used in section 1170.18 - Proposition 47's retroactive petition process. *Lara* held those charged with Proposition 47 eligible crimes not yet sentenced on November 5, 2014 could seek direct relief outside the petition process because the petition to recall a sentence applied to a "person who, on November 5, 2014, was serving a sentence for a conviction . . . who would have been guilty of a misdemeanor under the act that added this section . . . ." (§ 1170.18, subd. (a); *Lara, supra*, 6 Cal.5th at pp. 1131-1134.) As in *Lara*, section 1170.95 does not apply to Thomas because on January 1, 2019, he was not serving a sentence when SB 1437 took effect.

While the words used in sections 1170.18 and 1170.95 to determine who must use the petition procedure differ, we discern a similar intent. First, in looking backwards to persons already sentenced, the legislative (or the voter's) intent under both laws was to apply the changes retroactively to previously sentenced persons, even those with final judgments, more broadly than what the *Estrada* rule would permit. This expands the resentencing remedy to the greatest population of petitioners possible. Second, in going forward from the effective date, the legislative intent under Proposition 47 and SB 1437 is to ameliorate the harsher reach of the former laws and prospectively apply the substantive amendatory changes to persons who come before the court after the effective date. Just as the Legislature sought to have SB 1437 retroactively apply to

the greatest population of those with judgments (both final and non-final), it stands to reason, the Legislature looked to apply the substantive changes to sections 188 and 189 to the greatest degree going forward. This intent is inferred from the gateway eligibility requirements stated in section 1170.95 triggered by the effective date. Thus, because section 1170.95 does not apply to him, Thomas, and persons similarly situated, may seek direct *Estrada* relief by filing a new trial motion to challenge the legality of the verdict based on the changes to sections 188 and 189.

While we view the language in section 1170.95 dispositive, others may disagree. Here, even if we were to find section 1170.95 ambiguously phrased, the result would not change based on the rule of lenity regarding two interpretations that stand in relative equipoise. The interpretation favorable to Thomas is that the words and phrases used by the Legislature show it intended section 1170.95 to be a post-judgment remedy for persons convicted and sentenced before January 1, 2019. The contrary argument is that the Legislature intended section 1170.95 to operate as a "catch-all" functional equivalent of a savings clause. Here, every person convicted of felony murder, or, murder under a natural and probable consequences doctrine, even those convicted before the effective date and not yet sentenced on the effective date, must seek their remedy via the section 1170.95 process. This means, the trial court would be required to sentence a defendant, like Thomas, to a potentially invalid conviction before he could seek relief. We agree with trial counsel for Thomas that such a result is unusual and extraordinary. It also appears inconsistent with the legislative intent to apply the substantive changes to sections 188 and 189

21

broadly.  Be it so, we posit the two interpretations at least stand in relative equipoise.  As such, the rule of lenity favoring a defendant, here, Thomas, is triggered resulting in the application of the *Estrada* rule.[7]  As such, the trial court erred when it denied Thomas's motion for a new trial under a belief section 1170.95 was his only remedy.

## II.     Accomplice Liability Instruction

Thomas contends the trial court committed instructional error on the accomplice/codefendant instruction improperly suggesting Thomas's testimony should be viewed with caution and needed corroboration.  Our review of this contention shows he raised it to challenge the murder conviction.  As we reverse the judgment on the murder conviction based on his SB 1437 contention, this issue has been rendered moot.  However, Thomas again raises this argument as a part of his additional contention that the denial of his severance motion violated his due process right.  We analyze this contention for that reason and find it lacks merit.

### A.     Relevant Proceedings

When the trial court conducted a hearing on jury instructions, counsel for Thomas informed the trial court he objected to giving certain accomplice instructions because they "would unfairly instruct the jury to view Mr. Thomas's testimony

---

[7]     See *People v. Ramos* (2016) 244 Cal.App.4th 99, which discusses the *Estrada* rule in the context of legislative changes to substantive criminal statutes and held that the new elements apply retroactively requiring a new trial.  (*Id*. at pp. 103-104.)  Because the trial court asked the jury to specify the murder theory it adopted (first degree felony murder), the result of the motion for a new trial is evident – which is to grant a new trial.

with skepticism." In light of the three codefendants taking the stand to implicate Cleveland of murdering Ford, however, the trial court informed all counsel he intended to give the accomplice testimony instructions. All counsel objected.

Amongst the accomplice testimony instructions given to the jury, the trial court gave CALJIC No. 3.18 which provides:

"To the extent that an accomplice or a codefendant gives testimony that tends to incriminate another defendant, it should be viewed with caution. This does not mean, however, that you may arbitrarily disregard that testimony. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the evidence in this case."

The trial court also gave CALJIC No. 3.11 which instructs:

"You cannot find a defendant guilty based upon the testimony of an accomplice or the testimony by a codefendant that incriminates the defendant unless that testimony is corroborated by other evidence which tends to connect that defendant with the commission of the offense. [¶] Testimony of an accomplice or by a codefendant includes any out-of-court statement purportedly made by an accomplice or a codefendant, received for the purpose of proving that what the accomplice or the codefendant stated out of court was true."

## B. Legal Principles

A claim of instructional error is reviewed de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210 [17 Cal.Rptr.3d 532, 95 P.3d 811].) The challenged instruction is viewed "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in

23

an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229 [144 Cal.Rptr.3d 716, 281 P.3d 799].)

When a defendant takes the stand, denies guilt and implicates a codefendant in a joint trial, "a trial court has authority to instruct the jury that his testimony should be viewed with distrust as that of an accomplice." (*People v. Alvarez* (1996) 14 Cal.4th 155, 218 (*Alvarez*).)  This is so because "an accomplice who testifies against a defendant deserves 'close scrutiny' . . . even if he is himself a defendant.  Like any other accomplice, an accomplice-defendant has the motive, opportunity, and means to try to help himself at the other's expense." (*Id.* at p. 219.)

*People v. Guiuan* (1998) 18 Cal.4th 558 (*Guiuan*) provides guidance on the proper practice on how accomplice testimony instruction should be given.  Prior to *Guiuan, People v. Williams* (1988) 45 Cal.3d 1268 set out a 3 part rule on the trial court's duty to instruct jurors regarding accomplice testimony:  (1) when an accomplice is called by the prosecution, the court must instruct that accomplice testimony should be viewed with distrust, (2) when the accomplice is called by the defendant alone, it is error for the court to instruct the jurors sua sponte that it should view the testimony with distrust, and (3) when an accomplice is called by both the prosecution and the defense, the instruction should be tailored to relate only to the testimony on behalf of the prosecution. (*Guiuan, supra*, 18 Cal.4th at pp. 565-569.)  These rules were laid on top of another rule stated in *People v. Graham* (1978) 83 Cal.App.3d 736, which held that it was error, absent a request by the defendant, for a trial court to give the accomplice testimony instruction when a witness was

called by the prosecution but gave favorable testimony for the defendant.  (*Id*. at p. 743.)

To assist trial courts and attorneys navigate this territory, *Guiuan* held, rather than focusing on which side called the witness, or, whether the testimony was favorable or unfavorable to a particular side, the wording of CALJIC No. 3.18 should instead refer to "testimony that tends to incriminate the defendant." (*Guiuan, supra*, 18 Cal.4th at pp. 568-570.)  *Guiuan* further explained, "the jury should be instructed to the following effect whenever an accomplice, or a witness who might be determined by the jury to be an accomplice, testifies: '*To the extent an accomplice gives testimony that tends to incriminate the defendant*, it should be viewed with *caution*.  This does not mean, however, that you may arbitrarily disregard that testimony.  You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the evidence in the case.' " (*Id*. at p. 569, italics added.)

*Guiuan* went further.  In calling to change the words "with distrust" to "with caution," the court "explained that '[t]he word "caution," connoting "care and watchfulness," signals the need for the jury to pay special heed to *incriminating* testimony because it may be biased, but avoids the suggestion that *all* of the accomplice's testimony, including favorable testimony, is untrustworthy.' [Citation.]  Because the accomplice testimony instructions expressly single out 'incriminating' testimony to be viewed with care and caution, they do not suggest the jury must apply this standard to *all* testimony given by an accomplice." (*People v. Johnson* (2016) 243 Cal.App.4th 1247, 1274 (*Johnson*).)

Despite these safeguards, trial courts must still exercise a level of care to avoid prejudice when the accomplice's testimony is

simultaneously both incriminating and self-exculpatory. *Johnson* involved a three-count prosecution for murder, attempted murder, and attempted kidnapping against two defendants. One of the defendants was also charged with a weapons enhancement under section 12022, subdivision (b)(1) for the use of a bat. Both defendants took the stand and testified the other used the bat. (*Johnson, supra,* 243 Cal.App.4th at p. 1275.)

*Johnson* noted, "[w]e discern a potential for prejudice . . . only if testimony by one of the defendants was at once incriminating as to the other defendant (and so to be viewed with caution and as requiring corroboration) and self-exculpatory (and so to be viewed according to the usual standards)." (*Johnson, supra*, 243 Cal.App.4th at pp. 1274-1275.) The court further explained, "[t]his might have been true of the testimony regarding the assault with the bat, which Johnson attributed to Thornton and Thornton attributed to Johnson. Since each blamed the other, and only one such assault occurred, the same testimony that tended to incriminate the other defendant also tended to exonerate the testifying defendant." (*Id*. at p. 1275.) *Johnson* found no prejudice because the jury did not find the use of the bat "true." (*Ibid.*)

### C. Analysis

Thomas relies heavily on *People v. Fowler* (1987) 196 Cal.App.3d 79 (*Fowler*), a case decided before *Alvarez,* which held a trial court commits error if it gives the accomplice testimony instruction (to view with "distrust" testimony by a codefendant) when a defendant takes the stand to give self-exculpatory testimony which incriminates a codefendant. (*Id*. at p. 87.) *Fowler* involved a two-defendant prosecution for voluntary manslaughter where one of the defendants testified in trial that

26

the other defendant " 'was mad and was banging [the victim's] head on the concrete' " which led to the victim's death. (*Id.* at p. 84.) "The court instructed the jury, '[t]he testimony of an accomplice which tends to incriminate the other in the offense for which they are on trial should be viewed with distrust.' " (*Id*. at p. 85.) Decisional law in this area has moved quite a bit since *Fowler* was published. *Alvarez*, which authorizes, but does not mandate, trial courts to instruct in such circumstances, is the current rule.

Thomas also cites *People v. Coffman and Marlow* (2004) 34 Cal.4th 1 (*Coffman and Marlow*), and argues, the proper method for trial courts to instruct when faced with this issue is to more expressly explain how jurors should approach their task. In *Coffman and Marlow*, both defendants testified, and each gave self-exculpatory testimony and incriminated the other defendant. To address this situation, the trial court modified CALJIC No. 3.18 to read:

" 'You are to apply the general rules of credibility when weighing Cynthia Coffman's testimony in her own defense. [¶] But if you find her to be an accomplice, then in weighing her testimony against James Gregory Marlow you ought to view it with distrust. [¶] This does not mean that you may arbitrarily disregard such testimony. [¶] But give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case. [¶] You are to apply the general rules of credibility when weighing James Gregory Marlow's testimony in his own defense. [¶] But if you find him to be an accomplice then in weighing his testimony against Cynthia Coffman you ought to view it with distrust. [¶] This does not mean that you may arbitrarily disregard such

testimony. [¶] But give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case.'" (*Coffman and Marlow, supra,* 34 Cal.4th at p. 104.)

Thomas contends, since the trial court's instruction was unlike *Coffman and Marlow* and more like *Fowler*, giving the instruction was error. We disagree.

First, the trial court's instruction here was not like *Fowler*, but in a form approved in *Guiuan* using the words "with caution" instead of "with distrust." The jury was also informed that the testimony to be viewed with caution was not the entire testimony, but only "[t]o the extent that an accomplice or a codefendant gives testimony that tends to incriminate another defendant[.]" (CALJIC No. 3.18.) Although Thomas asserts the "to the extent" language in CALJIC No. 3.18 "did not render the instruction correct" because it did not clarify the two different credibility rules depending on how the jury used the testimony, we cannot fathom how any juror would misunderstand the proper application of this rule – that the testimony given by an accomplice that incriminates a codefendant is to be viewed with caution and nothing more. Indeed, "[a]lthough the Supreme Court approved the instruction that was given in *Coffman and Marlow*, which explicitly addressed how the jury should treat an accomplice's testimony in his or her own behalf, it did not require this instruction." (*Johnson, supra,* 243 Cal.App.4th at p. 1274.) It was proper for the trial court to give CALJIC No. 3.18 without modifying the instruction like in *Coffman and Marlow*.

Furthermore, the potential problem of a self-exonerating testimony that simultaneously incriminates as discussed in *Johnson* does not exist here. In *Johnson*, a single bat was used to

28

commit the crime and since "only one such assault occurred," only one person could have used the bat. (*Johnson, supra*, 243 Cal.App.4th at p. 1275.) While Thomas's testimony in trial generically fits this rubric, it did not box the jurors into an either/or scenario. The trial court gave the standard instruction on aiding and abetting. As a possible aider and abettor of the Ford robbery/murder, the jurors would need to conclude he shared in Cleveland's alleged intent to rob Ford. On this, Thomas testified as follows:

Counsel for Thomas: "And once - - was there any particular reason why you stopped where you did? I'm talking about after the 70th Street?"

Mr. Thomas: "Yeah, to calm down, man, and to confront Cleveland."

Here, Thomas had yet to point the accusatory finger at Cleveland for allegedly robbing and killing Ford. As the court explained in *Johnson*, "[t]he essence of each defendant's defense was that he did not intend to facilitate an attempted robbery or kidnapping, Johnson because he had independent motives for going to the campground and Thornton because he was unaware of the direct perpetrators' intent. As there was nothing in either defendant's defense of 'I did not intend to do this' that could be viewed as incriminating the other defendant, nothing in [the accomplice testimony instruction] directed the jury to view this testimony under anything other than the usual rules for evaluating a witness's credibility." (*Johnson, supra*, 243 Cal.App.4th at pp. 1274-1275.)

Here, the same reasoning applies with equal force. When Thomas testified he stopped the car to calm down and to confront Cleveland for his prior actions before the Ford incident, he had

yet to incriminate Cleveland of the robbery.  According to Thomas's testimony above, he did not stop the car with the intent to rob Ford.  As explained in *Johnson*, this type of statement was not simultaneously self-exonerating and incriminatory and the normal rule on credibility applied.

Thomas next contends CALJIC No. 3.11 was erroneous because the instruction failed to inform the jury that "when it viewed . . . [Thomas's] testimony for the purpose of assessing [his] *own* guilt or innocence, no corroboration was required."

This argument lacks merit.  CALJIC No. 3.11 informed the jury that corroboration is required only when accomplice testimony is used to convict a defendant.  (CALJIC No. 3.11 ["You cannot find a defendant guilty based upon the testimony of an accomplice or the testimony by a codefendant that incriminates the defendant unless that testimony is corroborated by other evidence which tends to connect that defendant."].)  There is no reasonable likelihood the jurors would have misunderstood this instruction and misapplied it in the manner Thomas suggests.  There was no error.

## III.   Allegation of Prosecutorial Misconduct

Thomas next contends the prosecutor committed misconduct in closing argument when she lessened the reasonable doubt standard by asserting that only what was in evidence – not the absence of evidence – could establish reasonable doubt.  We disagree.

### A.    Relevant Proceeding

Before counsel's closing arguments, the trial court read the general instructions to the jury including CALJIC No. 2.90[8] on

---

[8]    CALJIC No. 2.90 given by the trial court read:  "A defendant in a criminal action is presumed to be innocent until

30

reasonable doubt.  Near the end of her rebuttal argument, the prosecutor discussed reasonable doubt with the jury:

The Prosecutor:  "And what the defense is asking you to do is to say that there is a reasonable doubt as to each defendant's guilt.  You have the jury instruction that talks about reasonable doubt not being a mere possible doubt because everything related to human affairs is open to some possible or imaginary doubt.  [¶] If you're being asked to question 'What if,' or consider things that we don't know, or wonder if facts could have been proved, they're asking you to speculate, to go beyond what you have in evidence. They're asking you to imagine facts and circumstances.  If you have to image it or guess about it, it is not evidence and should not be considered or discussed.  It is an imaginary doubt, not a reasonable doubt."

When the prosecutor made the above comments to the jury, no defense counsel objected.  Much earlier in the rebuttal argument, the prosecutor commented on the closing argument by counsel for Thomas:

The Prosecutor:  " 'The police did a crappy investigation.' [Counsel for Thomas] pointed to two specifics.  Sorry it's so small, the writing.  He was talking about the print on the Rossi.  Well,

---

the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty.  This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt.  [¶]  Reasonable doubt is defined as follows:  It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt.  It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

you heard Detective Callian talk about the choices he had to make and that he didn't even actually see that gun, that it was taken to firearms to rush the job on getting ballistics evidence, because, as I told you in the very beginning, in opening statements, the ballistics in this case is everything.  And you notice none of their arguments really touched on ballistics.  None of their arguments touched on the actual evidence in this case."

Counsel for Cleveland:  "That's shifting the burden onto the defense."

The trial court overruled the objection.

### B.    Legal Principles

"Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' [Citation.]  By contrast, our state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and ' "it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct" ' [citation].  To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct, unless an admonition would not have cured the harm." (*People v. Davis* (2009) 46 Cal.4th 539, 612 [94 Cal.Rptr.3d 322, 208 P.3d 78] (*Davis*).)  Defense counsel's failure to object and request an admonition waives a misconduct claim on appeal "unless an objection would have been futile or an admonition ineffective." (*People v. Arias* (1996) 13 Cal.4th 92, 159.)  Under state law, when the claim "focuses on comments made by the prosecutor before the jury, the question is whether

32

there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072.)

Where the alleged misconduct arises from the prosecution's rebuttal argument, "[p]rosecutors may make vigorous arguments and fairly comment on the evidence; they have broad discretion to argue inferences and deductions from the evidence to the jury. [Citation.] In particular, '[r]ebuttal argument must permit the prosecutor to fairly respond to arguments by defense counsel.' [Citations.] Indeed, 'even otherwise prejudicial prosecutorial argument, when made within proper limits in rebuttal to arguments of defense counsel, do[es] not constitute misconduct.' [Citations.] In such circumstances, the prosecutor 'cannot be charged with misconduct if [her] comments only spill over somewhat into a forbidden area; the departure from propriety must be a substantial one.' [Citation.]" (*People v. Reyes* (2016) 246 Cal.App.4th 62, 74.) "[A] prosecutor is justified in making comments in rebuttal, perhaps otherwise improper, which are fairly responsive to argument of defense counsel and are based on the record." (*People v. Hill* (1967) 66 Cal.2d 536, 560.) Despite such leeway, "it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation]." (*People v. Marshall* (1996) 13 Cal.4th 799, 831.)

### C.    Analysis

The Attorney General claims Thomas forfeited this claim by failing to object and seek a curative admonition from the trial court. Thomas claims an objection was raised by counsel for Cleveland when the prosecutor commented on the closing

33

argument by counsel for Thomas.  He further contends, based on the trial court's ruling on the earlier objection by counsel for Cleveland, an objection would have been futile.

"A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, *and on the same ground*, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety. [Citation.]" (*People v. Thornton* (2007) 41 Cal.4th 391, 454, italics added.)  This is so, because in many instances, a timely objection and an admonition "would have cured any resulting harm." (*Ibid*.)  This did not happen.  Furthermore, the objection by counsel for Cleveland to an earlier portion of the prosecutor's rebuttal argument was on shifting the burden of proof, not on lessening the reasonable doubt standard.  In any event, counsel for Thomas did not join the objection.

Recognizing the lack of an objection to preserve the specific issue, Thomas contends an objection would have been futile based on the trial court's response to an earlier objection.  When the prosecutor explained the circumstantial evidence instruction, counsel for Cleveland objected on the ground the explanation misstated the law.  To this the trial court responded, "They have all the law.  I have great confidence that this jury is going to be able to handle the evidence and apply the law."  From this comment, Thomas discerns other objections would have been futile – that this comment suggests the trial court was predisposed to overruling objections on alleged misstatements on the law.  On the contrary, the record shows the trial court diligently and courteously dealt with each objection and when deemed appropriate, sustained them.  For example, when counsel for Lenoir misstated the circumstantial evidence standard, the

trial court properly sustained the objection. Thomas's futility argument is not supported by the record. By not interposing a specific objection, Thomas has forfeited this contention.

In any event, the prosecutor did not commit misconduct. The prosecutor's rebuttal comments at issue are connected to a ruling the trial court made during Lenoir's closing argument. Counsel for Lenoir argued the gun shot residue test would have shown Cleveland to be the shooter:

Counsel for Lenoir: "If any case ever called for gunshot residue, it is this case . . . [¶] . . . All it would have taken is four little pieces of foam . . . and somebody to look at it with a microscope could tell you which one of these people fired a firearm that night. [¶] Five dollar's worth - - would you have liked to have had that? Wouldn't that have made your job a little bit easier? Just to say, at the least, to have a simple test that told you: 'this guy is consistent with firing a firearm; this one isn't; this one isn't and this one isn't.' If there had, I'm sure that it would have shown that Mr. Cleveland fired a firearm."

Counsel for Cleveland: "I'm going to object to that."

The trial court initially overruled the objection but conducted a sidebar conference. There, counsel for Cleveland argued while Lenoir can point the accusatory finger at Cleveland as the shooter, it was improper for counsel for Lenoir to speculate the GSR would have shown Cleveland to have been the shooter. When the prosecutor was asked by the trial court her views, she agreed with counsel for Cleveland. Thereafter, the trial court informed the jury to disregard the argument about what the GSR test would have shown as speculative. This places the prosecutor's comment in its proper light. In her rebuttal, rather than attempting to lessen the reasonable doubt standard, the

prosecutor was responding to a defense argument that invited the jurors to speculate. The argument was made within the proper limits of rebuttal and was responsive to an argument made by counsel for Lenoir. The prosecutor never argued reasonable doubt could not be based on lack of evidence. Instead, she urged the jurors not to speculate about the scientific evidence. There was no misconduct.

Thomas next asserts his trial counsel's failure to object to the alleged misconduct deprived him effective assistance of counsel. To obtain relief on appeal for ineffective assistance of counsel, the appellant must establish (1) that his counsel's performance was so deficient that it amounted to a failure to function as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficiency prejudiced the outcome. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); and see, e.g., *People v. Pensinger* (1991) 52 Cal.3d 1210, 1252.) An attorney's performance is deficient under *Strickland* when his conduct falls below objective standards of reasonableness under prevailing professional norms. (*Strickland, supra*, at p. 688.) Prejudice under *Strickland* is established where there is a reasonable probability that, absent counsel's alleged errors, the outcome of the proceeding would have been different. (*Id.* at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*)

Here, appellant bears the burden to establish ineffective assistance on both deficient performance and prejudice. (*Strickland, supra*, 466 U.S. at p. 690.) The silent record, as here, does not establish either prong of the *Strickland* test. Concerning ineffective assistance of counsel claims on a silent record raised on appeal, the California Supreme Court has

explained unless counsel was asked for an explanation and failed to answer, or there simply cannot exist a satisfactory explanation, claims on appeal are to be rejected. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) Here, we have no way to discern why trial counsel failed to object. As such, on this appeal, we reject Thomas's claim of ineffective assistance.

## IV. Allegation of Misconduct by Counsel for Codefendant Cleveland

Thomas contends counsel for Cleveland committed pervasive misconduct which denied Thomas due process of law. We disagree.

### A. Legal Principles

Both Thomas and the Attorney General cite *People v. Estrada* (1998) 63 Cal.App.4th 1090 (*Estrada*), as authority for the rule that misconduct by counsel for a codefendant can violate an appellant's constitutional rights. (*Id*. at pp. 1095-1096.) Recognizing the dearth of precedent in this area of the law, *Estrada* resorted to the "prosecutorial misconduct" rubric and applied the federal, as opposed to the state, rule to determine whether codefendant's counsel violated the appellant's due process rights. (*Ibid.*)

The conduct of codefendant's counsel in *Estrada* were egregious and specifically targeted at the appellant in that appeal. First, codefendant's counsel suggested to the jury in opening statement and closing argument that information outside of the evidence presented at the trial showed appellant was guilty. (*People v. Estrada, supra*, 63 Cal.App.4th at pp. 1099-1100.) Next, apparently upset that the trial court had not granted his severance motion, counsel for codefendant told the jury that appellant had invoked his Fifth Amendment right

37

against self-incrimination when he called appellant to testify in his own client's preliminary hearing. (*Id.* at pp. 1100-1101.) When appellant called his previous lawyer to the stand to testify, counsel for codefendant suggested his first lawyer believed appellant was guilty. (*Id.* at pp. 1103-1104.) When appellant testified, the trial court permitted the appellant to be impeached with his prior conviction. Instead of staying in bounds, counsel for codefendant "repeatedly cited the prior convictions to show appellant's propensity to commit crimes like those" charged against the appellant. (*Id.* at p. 1105.) In his closing argument, counsel for codefendant argued appellant's trial counsel did not believe appellant's testimony. (*Id.* at p. 1106.)

In summarizing its view of counsel for codefendant's misconduct, the *Estrada* court wrote, "We join with appellant's trial counsel, the prosecutor and trial judge in noting that we have never seen a display of misconduct rivaling that of [counsel for the codefendant] in this case. Whatever his motivation, he did everything in his power, ethical and otherwise, to destroy appellant's credibility." (*Estrada, supra*, 63 Cal.App.4th at p. 1106.)

Prosecutorial misconduct under federal law is based on the Fourteenth Amendment of the federal Constitution. (*People v. Powell* (2018) 6 Cal.5th 136, 172.) *Estrada* cites two cases as authority that misconduct by a codefendant's counsel can violate a defendant's constitutional rights: *People v. Hardy* (1992) 2 Cal.4th 86, and, *People v. Haldeen* (1968) 267 Cal.App.2d 478. Both *Hardy* and *Haldeen* dealt with a defendant's right to remain silent under the Fifth Amendment of the federal Constitution and

extended the *Griffin* rule[9] that prevents a prosecutor from commenting on a defendant's silence at trial to codefendant's counsel. The Fifth Amendment was incorporated and made applicable to the states through the Fourteenth Amendment. (*Malloy v. Hogan* (1964) 378 U.S. 1, 6.)

The Fourteenth Amendment of the federal Constitution requires state action.[10] It " 'erects no shield against merely private conduct, however discriminatory or wrongful.' [Citation.]" (*Garfinkle v. Superior Court* (1978) 21 Cal.3d 268, 276.) There is, however, a U.S. Supreme Court precedent finding state action based on a private actor's conduct in a civil trial. In *Edmonson v. Leesville Concrete Co., Inc.* (1991) 500 U.S. 614 (*Edmonson*), Justice Kennedy held a private attorney's use of peremptory challenges in jury selection of a civil trial "represents a unique governmental function delegated to private litigants by the government and attributable to the government for purposes of invoking constitutional protections against discrimination by reason of race." (*Id.* at p. 627.) As rationale for finding private actor's action constitutes "state action," Justice Kennedy considered that "[r]ace discrimination within the courtroom raises serious questions as to the fairness of the proceedings

---

[9]    *Griffin v. State of California* (1965) 380 U.S. 609 held the prosecutor's comments on the defendant's failure to testify violated the self-incrimination clause of the Fifth Amendment. (*Id.* at p. 613.)

[10]    Clause 1 of the Fourteenth Amendment states in pertinent part, "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." (U.S. Const., 14th Amend., cl. 1.)

conducted there.  Racial bias mars the integrity of the judicial system and prevents the idea of democratic government from becoming a reality.  [Citations.]"  (*Id*. at p. 628.)

A similar rationale applies here.  While counsel for Cleveland is not the prosecutor, he was involved in a criminal jury trial which can only happen through state action when the prosecution decides to utilize its executive power to file a criminal case.  When counsel for a codefendant attacks another defendant, such conduct may inadvertently assist the prosecutor's case against such a defendant.  While a defense attorney's job is to provide undivided loyalty to his or her client against the prosecution, in a multi-defendant case, this job can take on the attributes of a "prosecutor" by casting blame on a codefendant.  In such circumstances, counsel cannot be permitted to roam as a free radical and trounce on the rights of the other defendants.

Furthermore, a criminal trial is overseen by a trial judge who is an appointed/elected state official, and the trial occurs in a public courtroom where the accused enjoys the protection of various constitutional rights under both state and federal laws.  In a criminal case, a trial judge has a statutory duty "to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."  (§ 1044.)  "In exercising [this] control . . . the judge has a duty to be impartial and to make certain that the defendant in a criminal case is afforded a fair trial."  (*People v. Blackburn* (1982) 139 Cal.App.3d 761, 764-765.)  Unlike a civil trial as in *Edmonson*, a criminal trial involves the liberty interests of the accused.  In a multi-defendant case, each defendant is entitled to a fair and

impartial trial.  In such a setting, misconduct by a codefendant's counsel within the courtroom shifting blame to a particular codefendant through misconduct raises serious questions as to the fairness of the proceedings and such misconduct has the potential to mar the integrity of the judicial system.  Therefore, we hold in the context of a multiple defendant criminal trial brought by the state, misconduct by a codefendant's counsel constitutes state action for purposes of the Fourteenth Amendment.  We agree with *Estrada*, the rules for assessing prosecutorial misconduct under federal law fits best.

As noted in section III(B) of this opinion, a prosecutor commits reversible misconduct only if the conduct infects the trial with such unfairness as to make the resulting conviction a denial of due process.  (*Davis, supra*, 46 Cal.4th at p. 612.)  Counsel must raise a specific objection and seek a curative admonition to preserve the issue on appeal unless such an objection would have been futile.  (*Ibid.*)

**B.    Analysis**

**1.    "Three White Attorneys"**

During his closing argument, counsel for Cleveland argued in favor of finding Cleveland's former girlfriend, Mercedes Paries, a credible witness.  Paries is African American and did not know Cleveland was a member of a criminal street gang:

"Mercedes Paries, she's not a gang member.  She has a real job; she's an armed guard for Metro.  She was in a relationship with [Cleveland] for seven years.  She told you during that time she gave him phones.  Basically what she told you is, she has him on an electronic collar.  And, you know, the truth isn't always pretty . . . [¶] . . .

41

"What is it that the three white attorneys find so difficult to understand about . . . [¶] . . . a black woman in South L.A. . . ."

At this point, counsel for Ritchie objected which the trial court overruled.

Thomas contends this statement served no purpose but to incite racial passions and prejudices. We disagree.

First, Thomas forfeited this issue by failing to lodge a specific objection. Second, we do not deem the statement as misconduct that rises to the level of a federal due process violation. The apparent purpose behind the comment was to dispel myths about implied bias – that people of different races do not fully understand the cultural norms of those belonging to other races. While the comment was "out of the box," the intent was not to inflame passion and prejudice, quite the opposite. In any event, our reading of the record shows gang warfare between rival gangs of the same race was the prosecution's overall theory. This case did not involve issues of racial tension. Third, unlike the misconduct that occurred in *Estrada* which were directed at the appellant in that case, the comments here were not focused on Thomas and we find it hard to see how they negatively impacted Thomas. This was not a misconduct, if at all, of a nature that violated Thomas's due process right under the Fourteenth Amendment.

### 2. Comments About Codefendant Ritchie's Belizean Background

Shannon Ruffinelli lived with Beverly at the residence where the shooting at an inhabited dwelling occurred. During her testimony, she indicated she was involved in an altercation not related to the shooting where she was assaulted in an attempt to break up the argument. She identified two unknown

men as being involved:  one - a tall mixed-race person, maybe a foreigner, and the other - a person with possibly long hair.

Counsel for Cleveland attempted to cast codefendants Ritchie and Lenoir as these two individuals.  He cross-examined Ritchie to achieve this end:

Counsel for Cleveland:  "You are a light-skinned, tall foreigner, are you not?

"[Mr. Ritchie:]  No, I'm not a foreigner.  I was born and raised in South Central L.A.

"[Counsel for Cleveland:]  You are Belizean?

"[Mr. Ritchie:]  Belizean, yes.

"[Counsel for Cleveland:]  And the person with you with the darker brown skin and the long hair, that was Mr. Lenoir?

"[Mr. Ritchie:]  I don't know what you are trying to insinuate. I don't understand your questioning.

"Counsel for Cleveland:]  When you guys punched Ms. Ruffinelli - -

"[Mr. Ritchie:]  I never hit a woman.  I don't know what you are talking about.

"[Counsel for Cleveland:]  You are a pimp and you never hit a woman?

"[Mr. Ritchie:]  I don't need to."

At this point, counsel for Ritchie objected which the trial court sustained.

On cross-examination of Thomas, counsel for Cleveland asked Thomas whether he observed Ritchie strike Ruffinelli. Thomas replied that no one had gotten out of the car.  Counsel for Cleveland also cross-examined Lenoir by asking whether it was he or Ritchie who had struck Ruffinelli. Lenoir responded, "That

was neither one of us." In his closing argument, counsel for Cleveland argued:

"Shannon Ruffinelli got sucker punched, and when that happened, standing next to her was a tall, light-skinned foreign guy with a darker brown-skinned male with longer hair. Between Ruffinelli and O.J., who are you going to believe? . . . Watch what I do with this one. Do you 'Beleaze' it?"

Again, this issue is forfeited. Counsel for Thomas neither raised a specific objection nor sought a curative admonition. Even if we were to find the issue not forfeited, the comments were not misconduct of a nature that violates Thomas's due process rights. The comments were not directed at Thomas, and the primary purpose was to discredit the testimony of Ritchie and Lenoir, and tangentially that of Thomas.

### 3. Use of Argumentative Questioning

Thomas next asserts counsel for Cleveland repeatedly posed argumentative questions to taint the jury and falsely imply the existence of evidence.

In his cross-examination of Ritchie, counsel attempted to cast Ritchie as a morally reprehensible person who, despite having two daughters, worked as a pimp in Las Vegas. In an effort to develop his theory that Ritchie came to Los Angeles to jump Lenoir into the Eight Trey Gangster Crips, counsel for Cleveland questioned Ritchie's manhood by asking, "Because the reality is you did come to put Mr. Lenoir on, but you are such a coward you had to take drugs in order to do it; right?" Here, the trial court sustained an objection lodged by counsel for Ritchie.

When counsel for Cleveland cross-examined Lenoir, he asked, "And you are so excited about getting on Eight-[Trey], you are in the car with the gun flashing gang signs and smiling all

big; right?"  When Lenoir testified he had told the police he was willing to take responsibility for the possession of a firearm, counsel for Cleveland asked, "So you are willing to admit that you shot the gun, but you are not willing to admit that you killed somebody when you shot the gun?"  The trial court sustained an argumentative objection lodged by counsel for Lenoir.

Counsel for Thomas did not join the objections raised by counsel for Ritchie and Lenoir.  "Generally, failure to join in the objection or motion of a codefendant constitutes a waiver of the issue on appeal."  (*People v. Santos* (1994) 30 Cal.App.4th 169, 180, fn. 8, disapproved on other grounds in *People v. Dalton* (2019) 7 Cal.5th 166.)  As such, Thomas has forfeited this issue.  In any event, unlike *Estrada*, these argumentative questions were not aimed at Thomas.  Again, we fail to see how these questions prejudiced Thomas.

### 4.     Distortion of Prior Statements of Codefendants

Thomas claims counsel for Cleveland mischaracterized or misquoted transcripts accusing the codefendants that they had made admissions of certain criminal conduct before the trial.  Counsel for Cleveland asked Lenoir whether he admitted to shooting at an inhabited dwelling when he spoke to the police at the time of his arrest.  In his statement to the police, Lenoir had stated, "There wasn't even no time for us to do nothing.  When we first did that, we pulled away a couple of blocks."  In another question to Lenoir, counsel for Cleveland asked whether he had told the detectives that Thomas was close to the decedent Ford at the time of the shooting.  The transcript showed Lenoir had responded to a question of relative distance, that Thomas was closer to Ford than Lenoir.  Counsel for Cleveland asked Thomas whether he had previously stated that Ritchie had brought the

45

gun, when, the transcript showed, Thomas had stated Lenoir had brought the gun.

Thomas has forfeited these issues because he did not raise an objection. Even if he had, these missteps by counsel for Cleveland, whether done intentionally or because of sloppy memory, did not prejudice Thomas because the comments did not implicate him of criminality.

### 5. Arguing Facts Not in Evidence

During closing argument, counsel for Cleveland mentioned facts not in evidence when he read portions of Thomas's police interview:

> "Because I'm still going to jail . . . the same extent as him, and that ain't the fucking truth, man. I don't know if he shot the niggas or not. He ain't shot shit out of my car, period. [¶] I don't give a fuck about him. I would have told you, like, 'Look, man, that nigger shot out my car. Nigger, I don't have nothing to do with it. Go take his ass to jail.' Man, he didn't shoot out my car, man. . . . [¶] I got family all over L.A. and them niggers are shooters, but I ain't seen him do shit."

The last sentence in the statement to the police was not admitted as evidence during the trial. It was error for counsel for Cleveland to read it. Thomas raised no objection and thus he forfeited the issue. On the merits, the offending statement was not prejudicial. It only tangentially impacted Thomas. By the end of trial, he had admitted to gang membership as an Eight Trey Gangster Crips. In his interview with law enforcement, he also told the police that "people don't ask where you're from. They just pull up and shoot you." The offending statement added little, if anything, to what Thomas had already informed the jury.

**6. Questions about Attorney-Client Privileged Communications and Suggestion that Ritchie Testimony was Coached**

Counsel for Cleveland cross-examined Ritchie about his testimony on direct examination that he left Los Angeles to get away from gang life. He asked, "Is that why, or is that the answer that [counsel for Ritchie] told you to say?" Counsel for Ritchie objected. The trial court sustained the objection. Counsel for Cleveland continued:

"[Counsel for Cleveland:] Did you and your attorney discuss your testimony?

"[Mr. Ritchie:] No.

"[Counsel for Cleveland:] He didn't- - you guys didn't have a conversation about what is going to be said?

"[Mr. Ritchie:] No.

"[Counsel for Cleveland:] He didn't prepare you in any way for this?

"[Mr. Ritchie:] No.

"[Counsel for Cleveland:] Do you wish he had?

"[Counsel for Ritchie:] Argumentative. Here we go again.

"The Court: I'm going to sustain that.

"[Counsel for Thomas:] This is also attorney-client privilege.

"The Court: I don't know about that, but anyway it is sustained."

Here, counsel for Thomas objected which preserved the issue on appeal, although no request for a curative admonition was made. This set of questions, aimed at eroding a witness's credibility, is standard and routine when defense counsel is cross-examining a witness. It is, however, problematic when posed to a

defendant who is represented by counsel. It is error to do so. However, here, the question was not posed to Thomas, but instead, to Ritchie. Thomas fails to show how this error impacted his own ability to receive a fair trial. This misconduct did not impair Thomas's Fourteenth Amendment right to due process.

**7.     Questions About Lying and Vouching for Officer Credibility**

Thomas contends counsel for Cleveland committed misconduct by asking him and Lenoir if police officers and other witnesses lied.

When Thomas testified, counsel for Cleveland asked whether the police testimony which differed from his testimony on which side the gun had been thrown was a lie. The trial court sustained its own objection and noted, the question was improper and for the jury to disregard it. Thomas was also asked whether witness Cousins was lying. Again, the trial court sustained its own objection.

Lenoir testified the Glock handgun was not loaded when he was arrested. This differed from police testimony that when the Glock handgun was recovered, it was fully loaded with one live round in the chamber. In cross-examination, counsel for Cleveland asked what Lenoir thought about the police testimony. Counsel for Ritchie objected which the trial court sustained.

In both instances, the trial court sustained its own or the objection raised by counsel. The trial court admonished the jury to disregard the question posed to Thomas. While the questions were improper, no prejudice resulted because Thomas admitted having lied to the jury on two occasions – first, about seeing Cleveland exiting a gay bar and second, about seeing Cleveland wearing a thong.

48

Thomas also complains that in closing argument, counsel for Cleveland vouched for the credibility of the police officers who had collected the physical evidence. He cites a recent California Supreme Court decision that held "the prosecutor's arguments that the officers would not lie because each would not put his 'entire career on the line' or 'at risk' constitute impermissible vouching." (*People v. Rodriguez* (2020) 9 Cal.5th 474, 481.) The rationale is that "[t]he prosecutor's career-related arguments 'convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury.' [Citation.]" (*Ibid*.)

This claim was forfeited by counsel for Thomas's failure to object. In any event, Thomas was not prejudiced by this comment to the jury. The danger of prosecutorial vouching does not exist, or, if it does, minimally so, when defense counsel makes the argument. Defense counsel normally has no special or on-going professional relationship with police officers since usually, perhaps always, the two are professional adversaries and do not share the common goal of prosecuting those accused of having committed crimes.

### 8. Ineffective Assistance of Counsel

In section III(C) of this opinion, we set out the standard for ineffective assistance of counsel. The same applies here.

Similar to the previous contention of prosecutorial misconduct, Thomas contends the failure of his trial counsel to object was ineffective representation in violation of the Sixth Amendment right.

Again, appellant bears the burden to establish ineffective assistance on both deficient performance and prejudice. (*Strickland, supra,* 466 U.S. at p. 690.) Of the seven claims of misconduct by counsel for Cleveland, counsel for Thomas objected once and did not join in any other objections raised by codefendants' counsel. We reiterate, a silent record does not establish either prong of the Strickland test unless there cannot simply exist a satisfactory explanation. (*People v. Mendoza Tello, supra*, 15 Cal.4th at p. 266.) However, satisfactory explanations abound. Of the seven complaints raised against counsel for Cleveland, five did not involve Thomas.

On the other two, Thomas fails to establish prejudice. First, as to commenting on a portion of Thomas's police interview not admitted as evidence ("I got family all over L.A. and them niggers are shooters, but I ain't seen him do shit."), the comment added little to Thomas's admitted testimony that he was a member of Eight Trey Gangster Crips, and that, "Where we're from people don't ask where you're from. They just pull up and shoot." Second, on counsel for Cleveland's improper "who is lying" questions posed to Thomas, the trial court sustained its own objection and admonished the jury to disregard them. Nothing in the record establishes the jurors' unwillingness or inability to follow this admonition. Thomas fails to show prejudice.

## V.    The Severance Motion Denial

Thomas contends, while the trial court's denial of his severance motion may have been within the bounds of the court's discretion based on what was known at the time the motion was heard, the joint trial ultimately resulted in a violation of his due process right. We disagree.

## A. Relevant Proceedings

Thomas made two motions to sever on the same grounds – that he and Cleveland would present conflicting defenses, and that fear of Cleveland may prevent Thomas from testifying. The trial court denied both motions.[11] In denying the second motion, the trial court explained its view that the two reasons cited by Thomas were insufficient to overcome the preference for joint trials, and that, "if there's ever a case that needed joint trials, it's the conduct that occurred here where all these events . . . all four defendants are present and involved in[.]"

## B. Legal Principles

Section 1098 provides in relevant part, "[w]hen two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials." "Section 1098 establishes a clear legislative preference for joint trials where . . . multiple defendants are charged with the same crimes against the same victims. [Citations.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 381.)

Separate trials may be appropriate "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." (*People v. Massie* (1967) 66 Cal.2d 899, 917, fns. omitted.)

---

[11] The first severance motion was heard on May 17, 2018 during jury selection of the joint trial before the trial was continued because of late discovery by the prosecution. The second severance motion was heard on July 16, 2018, again during jury selection of the joint trial.

Mutually antagonistic defenses, however, are not per se prejudicial. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 819 (*Daveggio and Michaud*).) On the contrary, severance is required for antagonistic defenses only when " ' "the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty." ' " (*Coffman and Marlow, supra*, 34 Cal.4th at p. 41.) "If the moving party's guilt can be established by sufficient independent evidence, 'it is not the conflict alone that demonstrates . . . guilt,' and severance is not required." (*People v. Winbush* (2017) 2 Cal.5th 402, 456 [213 Cal.Rptr.3d 1, 387 P.3d 1187], quoting *Coffman and Marlow*, at p. 41.) A trial court's denial of a severance motion is reviewed under the abuse of discretion standard, based on the facts at the time of the trial court's ruling. (*Coffman and Marlow,* at p. 41.) However, "[w]e have held that even if a trial court's ruling on a motion to sever is correct at the time it was made, a reviewing court still must determine whether, in the end, the joinder of counts or defendants for trial resulted in gross unfairness depriving the defendant of due process of law. [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 851.)

### C. Analysis

Thomas appears to concede the trial court's denial of his severance motions were within the bounds of discretion based on facts known at the time the motions were made. He focuses not on the denials, but instead, on the alleged prejudice that resulted from the failure to sever, as the basis of relief. We therefore address the contention that the joint trial ultimately resulted in a denial of due process.

"[Defendant] bear[s] the burden of establishing that the trial was grossly unfair and denied [him] due process of law, and 'a judgment will be reversed on this ground only if it is "reasonably probable that the jury was influenced [by the joinder] in its verdict of guilt." ' [Citation.]" (*Daveggio and Michaud, supra,* 4 Cal.5th at p. 821.)

Thomas argues the joint trial was grossly unfair because of the trial court's instructional error on accomplice testimony and the misconduct of counsel for Cleveland. He posits each contention independently violated Thomas's rights, but collectively resulted in depriving him due process of law.

We have already addressed the underlying contentions and found no error as to the accomplice testimony instructions, and, no misconduct in most of the allegations against counsel for Cleveland, and, where there was misconduct, no prejudice. Thomas has failed to establish gross unfairness.

## VI. Exclusion of Lay Opinion on Gang Territory

Thomas contends the trial court abused its discretion by excluding Shannon Ruffinelli's potential testimony on gang territory. We disagree.

### A. Relevant Proceedings

The prosecution's gang experts, Detective Marlon Prodigalidad and Officer Michael Barragan of the Los Angeles Police Department, testified the location of the shooting near the corner of Budlong and 70th Street, was Neighborhood Crips' territory. Both opined that Eight Trey Gangster Crips and Hoovers are allies and consider Neighborhood Crips a mutual enemy. Prodigalidad further opined that Thomas, Lenoir and Cleveland are members of Eight Trey Gangster Crips and Ritchie, a member of Hoovers. The prosecutor argued the motive

53

for the shooting at Beverly's home was to further the reputation of Eight Trey Gangster Crips gang.

Thomas sought to counter the prosecution's gang experts through calling his own witnesses. First, he called Alex Alonso, a professor who wrote his master's thesis on the territoriality of African American gangs in Los Angeles. Alonzo testified the area of Budlong and 70th Street in Los Angeles is claimed by the Eight Trey Gangster Crips, not the Neighborhood Crips. Thomas also looked to introduce the testimony of Shannon Ruffinelli as lay opinion on gang territory. Ruffinelli lived with Beverly at the home where the shooting occurred and would have testified the area is claimed by Eight Trey Gangster Crips.

The trial court conducted a motion in limine to determine the foundation for her lay opinion:

"[Counsel for Thomas:] And was there a specific gang that you knew when you were living there that claimed that territory?

"[Ms. Ruffinelli:] Yeah.

"[Counsel for Thomas:] Which gang was that?

"[Ms. Ruffinelli:] Eight-Trey Gangsters.

"[Counsel for Thomas:] And how did you know that?

"[Ms. Ruffinelli:] It's pretty much a family oriented block. A lot of people knew each other on [*sic*] in that area. So this is how I know that.

"The Court: All right. That is not going to be good enough. So what is the reason that you came up with, that it is Eight-Trey Gangster Crips? How did you reach that opinion?

"[Ms. Ruffinelli:] That is that area. That is the best I can give as good as I can.

"[Counsel for Thomas:] Did you know people who were members of or associated with the Eight-Trey Gangster Crips?

"[Ms. Ruffinelli:]  Not personally, no.

"[Counsel for Thomas:]  Okay.  Was it for safety reasons?  Is it more to know whether a gang claims a territory that you are living in?

"[Ms. Ruffinelli:]  Repeat that again?

"[Counsel for Thomas:]  For your own safety, is it important to know whether a gang claims a territory?

"[Ms. Ruffinelli:]  Oh, no.  No. Not for my safety.  I can care less.

"[Counsel for Thomas:]  And did you ever see graffiti that was associated?

"[Ms. Ruffinelli:]  Not on the street that I lived, but surrounding that neighborhood, yes.

"[Counsel for Thomas]:  And when you say surrounding that neighborhood - -

"[Ms. Ruffinelli:]  Like grocery store, liquor stores, you know, corner of Florence and Normandie.  That's about it."

The trial court ruled, "I'm going to bring the hearing to a close.  I have heard enough.  She doesn't have a sufficient foundation to give an opinion."

During Ruffinelli's cross-examination, the trial court again conducted a motion in limine, outside the presence of the jury, to determine whether a proper foundation existed for her opinion:

"[Counsel for Cleveland:]  You know that neighborhood to be an Eight-Trey Gangster Crip neighborhood?

"[Ms. Ruffinelli:]  Yeah.

"[Counsel for Cleveland:]  Has anyone told you this is Eight-Trey?

"[The Prosecutor:]  Objection.  Leading.

"The Court: It is leading. Sustained. Just ask her why she thinks that.

"[Counsel for Cleveland:] Why do you think that?

"[Ms. Ruffinelli:] You see them riding around the neighborhood. Like I said, I grew up in Los Angeles, California. You know the area. You know, I know every area I step into, and like I said earlier, if you go over to that liquor store on Florence and Normandie you will see Eight-Trey hit up there a lot and that is just that area. [¶] You know, I don't know how to explain either way. I never had anybody come up to me or gang bang on me or anything like that in that area. But that is the only way I know that that is just that area. Just like I know where Six-o's are. I know where 40 Avenues are. I know where Bloods are. I know where all that is. I was born and raised in Los Angeles. I know where I'm at.

"[Counsel for Cleveland:] You know those are the gangs because you've lived in those neighborhoods?

"[Ms. Ruffinelli:] That and I know that is what is over there. You can look at the writing on the wall.

"[Counsel for Cleveland:] After two years of living in that neighborhood, something must have taught you that Eight-Trey is in that neighborhood?

"[Ms. Ruffinelli:] Just look at the writing on the walls.

"The Court: All right, anyway, I think that is - - I heard enough. You already have a 402 hearing."

The trial court again denied the request to admit her opinion.

### B.    Analysis

"[A]n apellate court applies the abuse of discretion standard of review to any ruling by a trial court on the

admissibility of evidence.  [Citations.]"  (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)  "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' "  (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004 [81 Cal.Rptr.3d 299, 189 P.3d 300].)

Admissibility of lay opinion is governed by Evidence Code section 800.[12]  To be admissible, such opinions must be "[r]ationally based on the perception of the witness."  (Evid. Code, § 800, subd. (a).)  "A nonexpert witness may testify as to [her] opinion only if that opinion is based on [her] own perception."  (*People v. Ogg* (1968) 258 Cal.App.2d 841, 846.)

Ruffinelli failed to adequately show personal knowledge Beverly's home was located in Eight-Trey Gangster Crips' territory.  When asked either by counsel or by the trial court for the basis of her personal knowledge, she gave conclusory responses such as:  1) "It's pretty much a family oriented block," and 2) "Like I said, I grew up in Los Angeles, California.  You know the area."  Ruffinelli did not personally know or associate with any members of Eight-Trey Gangster Crips.  She did not acquire the information for personal safety reasons or because someone had "gang bang[ed] on me."  Ruffinelli's personal

---

[12]    Evidence Code section 800 states:

"If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is:

    (a) Rationally based on the perception of the witness; and

    (b) Helpful to a clear understanding of his testimony."

knowledge was limited to observations of gang graffiti, but she specifically noted, "Not on the street that I lived." But the street where she lived was the pertinent location. This was not a close call. The trial court's exclusion was entirely proper.

## VII. Cumulative Error

Thomas lastly contends even if the individual errors were harmless, "the errors all worked in concert" and "[t]heir cumulative effect rendered the trial so fundamentally unfair as to deny due process." We disagree.

Under the "cumulative error" doctrine, "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795 [118 Cal.Rptr.2d 668].)

"Lengthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice." (*People v. Hill, supra,* 17 Cal.4th at p. 844.) This trial was no exception. While the SB 1437 error requires reversal of the murder conviction, we have determined no other error occurred except for a few minor misconducts by counsel for Cleveland. These, even when combined, have not deprived Thomas due process of law.

## DISPOSITION

The judgment is reversed in Count 1.  The trial court is instructed to set aside its order denying the motion for a new trial and enter an order granting it as to Count 1.  In all other respects, the judgment is affirmed.

                                                        OHTA, J.*

We concur:


            BIGELOW, P. J.



            STRATTON, J.

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

59